Morales y Benet, Peticionarias, *v.* La Junta Local de Inscripciones, Etc., Demandada.

Nos. 219 y 220.—*Vistos:* Marzo 31, 1924. *Resueltos:* Abril 25, 1924.

Derecho Electoral—Sufragio—Mujeres.—La ley portorriqueña no concede el derecho del voto a la mujer y no habiendo sido hecha extensiva a Puerto Rico la enmienda 19 a la Constitución americana por declaración expresa del Congreso, y no siendo el derecho al sufragio un derecho personal fundamental, la ley local queda en toda su fuerza y vigor.

Solicitud para que se expida auto de *mandamus* a la Junta Local de Inscripciones ordenando la inscripción de las peticionarias, para fines electorales. *Sin lugar.*

B. Pagán, abogado de las peticionarias; *M. A. Muñoz, como delegado del Attorney General,* abogado de la demandada. *C: Coll Cuchí* compareció como *amicus curiæ* a nombre de la Liga Social Sufragista.

El Juez Presidente Señor del Toro, emitió la opinión del tribunal.

El 24 de marzo de 1924 se archivó en la Secretaría de esta Corte Suprema una solicitud de *mandamus* alegando substancialmente lo que sigue:·

Que la peticionaria, Mariana Morales Bernard, es ciudadana de los Estados Unidos de América, mayor de veinte y un años, vecina de San Juan, P. R., y de oficio tabaquera; que es nativa de Puerto Rico, ha residido siempre en la Isla y desde hace más de un año está domiciliada en Puerta de Tierra, barrio de la Municipalidad de San Juan, P. R.; que

nunca ha sido convicta de *felony*, ni. de delito electoral alguno, ni es persona asilada en institución pública o privada para locos, ni está bajo cuidado de tutor, ni depende para vivir de la caridad pública o privada, y que reúne todos los requisitos constitucionales, estatutorios y reglamentarios para inscribirse y votar en las elecciones generales de 1924; que la demandada es la Junta Local de Inscripciones y Elecciones del Primer Precinto de San Juan, compuesta de las personas que se mencionan, con los deberes que se especifi-. can y con capacidad para demandar y ser demandada; que el 24 de marzo de 1924, la peticionaria compareció personalmente al local en que estaba constituida la demandada y cumpliendo todas las formalidades exigidas por los reglamentos, solicitó su inscripción y la demandada se negó a ello únicamente por razón del sexo de la peticionaria.

Archivada la solicitud, se señaló la tarde del 31 de marzo para oir a la peticionaria y al Attorney General, si deseaba ser oído.

Entre tanto otra solicitud de igual naturaleza fué presentada por Milagros Benet de Mewton, y el abogado Cayetano Coll y Cuchí, a nombre de la Liga Social Sufragista de Puerto Rico, solicitó ser oído como *amicus curiæ.* Se adoptó igual resolución y el 31 de marzo comparecieron ambas peticionarias representadas por el abogado Bolívar Pagán, el *amicus curiæ*, y el Attorney General Auxiliar Miguel A. Muñoz en representación de la demandada. Terminada la audiencia, se concedió a las partes. un término de cinco días para presentar memorándums de autoridades que fueron en su oportunidad archivados, quedando así el caso sometido finalmente a la consideración y resolución de este tribunal.

¿Tiene derecho en los actuales momentos una mujer mayor de edad y que reúna todos los otros requisitos exigidos por la ley, a votar en Puerto Rico? Esa es la cuestión envuelta en este caso.

La ley local es como sigue: "Todo varón, ciudadano de los Estados Unidos, . . . . deberá votar . . . ."

La ley decretada por la Asamblea Legislativa de Puerto Rico y aprobada por el Gobernador, exige, pues, como una condición para votar que sea varón el elector, excluyendo, por tanto, a la mujer.

¿Qué dispone el Acta Orgánica? · Dice así:

"Artículo 35. — En las primeras elecciones que se celebren de acuerdo con esta Ley, los electores capacitados serán aquellos que tengan las condiciones de electores con arreglo a la ley actual. Después de esas elecciones los electores deberán ser ciudadanos de los Estados Unidos, que hayan cumplido veintiún años de edad, y tengan las demás condiciones que se prescribieren por la Asamblea Legislativa de Puerto Rico; *Disponiéndose,* que no se impondrá ni exigirá en ningún tiempo a ningún elector condición alguna que envuelva la posesión de propiedad."

La ley del Congreso es clara. · Con excepción de los requisitos de ser ciudadano de los Estados Unidos y de haber cumplido la · edad de veintiún años que ella misma fija y de la prohibición de imponer condición alguna que envuelva la posesión de propiedad, deja enteramente a la Asamblea Legislativa de Puerto Rico la facultad de prescribir las otras condiciones. Y ya hemos visto el uso que la Asamblea hizo de su facultad.

Se sostiene por las peticionarias que para interpretar la sección 35 transcrita, debe penetrarse en la intención del Congreso y que si así se hace, se verá que esa intención fué la de que no se estableciera distinción alguna por razón de sexo entre los electores, siendo por tanto nula la ley puertorriqueña. Su conclusión se basa en que habiéndose presentado un sustituto a la sección 35, que dice: "Art. 35.— Que los electores capacitados serán todos los varones de 21 años o más, que sean ciudadanos de los Estados Unidos," tal sustituto no fué aprobado.

La intención del Legislador se deduce de los términos mismos en que queda finalmente redactada la ley y nada

existe en la sección 35 que sostenga la conclusión de las peticionarias. Pero aún yendo a la misma fuente de información que ellas invocan, con la reserva de que el hacerlo así no implica que esta corte acepte que pueda fijarse de tal modo la intención del Legislador, se verá que sus constancias le son adversas.

El sustituto de que se ha hecho mérito fué presentado el 17 de febrero de 1917. (Congressional Record, vol. 54, parte 4, pág. 3,477), y luego retirado. Más tarde, el 20 de febrero de 1917, discutiéndose una enmienda que dice: "Que en las primeras elecciones que se celebren de acuerdo con esta ley los electores capacitados serán aquellos que tengan las condiciones de electores bajo la ley actual; después de esas elecciones los electores serán ciudadanos de los Estados Unidos, de veintiún años o más de edad, y que tengan los requisitos adicionales que puedan prescribirse," y que es sustancialmente igual a la sección 35 tal como quedó definitivamente aprobada, ocurrió lo que sigue:

"Sr. Martine, de New Jersey. Recientemente leí en un periódico un artículo en el que se decía que por este proyecto se intentaba conceder el derecho del sufragio a las mujeres de Puerto Rico. Si ese es el caso, no votaré conscientemente en favor de esa medida, pues soy incondicionalmente opuesto al sufragio femenino. Creo que sería un detrimento para la comunidad y una desgracia y un desastre para las mujeres. Si yo creyera que habría de elevar a la mujer y mejorar el bienestar de nuestra nación, estaría en favor de la misma; pero en mi concepto es todo lo contrario.

"Sr. Shafroth. Diré al Senador que bajo la ley actual las mujeres no votan, y consiguientemente el proyecto no les confiere privilegio alguno determinado excepto que da a la Legislatura de Puerto Rico derecho a determinar esas cuestiones, al igual que otras leyes del Congreso creando territorios." "Congressional Record," vol. 54, parte 4, pág. 3,667.

Pero las peticionarias van más lejos y aquí es que surge el verdadero problema jurídico planteado por ellas en este caso. Ellas sostienen que desde el momento en que se convirtió en ley suprema de la nación la enmienda décimo-

novena de la Constitución de los Estados Unidos, ni la Legislatura de Puerto Rico, ni el propio Congreso, pueden adoptar legislación alguna que prive a una persona por razón de su sexo, del privilegio de votar en esta Isla.

La enmienda dice:

"El derecho de los ciudadanos de los Estados Unidos a votar no será negado ni cercenado por los Estados Unidos ni por ningún Estado por razón de sexo."

Si la enmienda es aplicable, el caso debe resolverse a favor de las peticionarias. De eso no hay duda. La cuestión queda así reducida a decidir si rige o no la enmienda constitucional en Puerto Rico y ello levanta uno de los problemas más serios que se vió obligado a afrontar el Tribunal Supremo de los Estados Unidos después de la guerra hispano-americana y que durante más de veinte años de vez en cuando ha seguido ocupando las mentes de los jueces hasta que fué, al parecer, definitivamente resuelto en el caso de *Balzac* v. *People of Porto Rico,* 258 U. S. 298.

A dicho problema refiriéndose dice Charles Warren en el volumen 3, página 429 y siguientes de su obra titulada "The Supreme Court in United States History":

"En 1899 comenzó la larga serie de casos consecuencia de la guerra hispano-americana, que ocupó grandemente la atención de la corte durante los seis años siguientes. Los primeros en resolverse fueron varios casos de buques apresados en los cuales quedaron establecidos algunos puntos importantes de derecho internacional. A éstos siguieron, desde mayo de 1901 hasta 1905, los notables casos en que por fin se fijaron definitivamente el *status* y los derechos constitucionales de Cuba, del territorio recientemente adquirido de Puerto Rico, Filipinas y de Hawaii. 'Este drama judicial de verdaderas proporciones olímpicas' constituyó el suceso más importante en la historia de la corte durante el período transcurrido desde la muerte de Waite, y ha sido resumido en forma interesante como sigue: 'Cuando la guerra hispano-americana trajo como resultado la cesión a los Estados Unidos de Puerto Rico y las Filipinas, surgió inmediatamente la cuestión de su *status* constitucional. Esta, que entró seguidamente en el campo de la política, en la campaña presidencial de 1900, con

el grito de "imperialismo," dividió a los partidos políticos y a sus secuaces. La discordia que creó en la judicatura no fué menos pronunciada. Los casos de De Lima, Dooley y Bidwell presentaron en forma concreta las cuestiones, primero, si la Isla de Puerto Rico, después de su cesión por España, dejó de ser un "país extranjero" dentro del significado de las leyes de tarifa vigentes en los Estados Unidos; y segundo, hasta dónde, si en algo, caía la isla dentro de las cláusulas de rentas contenidas en la Constitución y del requisito de que todos los derechos, impuestos y arbitrios deben ser uniformes en todos los Estados Unidos. La división de opinión en la corte fué aguda y pronunciada. El primer criterio expresado fué el del Juez Sr. Brown, por sí solo. Siguió solitario un derrotero y sostuvo que aunque Puerto Rico había dejado de ser un "país extranjero" dentro del significado de la Ley Dingley, sin embargo, en cuanto a legislación subsiguiente (la Ley Foraker de abril 12, 1900), la cláusula de uniformidad no era aplicable; que Puerto Rico por la cesión vino a ser "territorio perteneciente" a Estados Unidos, pero no parte del mismo; y que aún tratándose de territorio contiguo del continente la Constitución sólo regía como resultado de acción expresa del Congreso. Contra esto el Juez Presidente Fuller y los Jueces Harlan, Brewer y Peckham sostenían que Puerto Rico, por lo menos al ratificarse el tratado, vino a ser parte de Estados Unidos, y que como tal sólo podía tratársele en la forma prescrita por la Constitución; o, para decirlo en las palabras de aquella época, la "Constitución sigue a la bandera." Entre estos dos extremos se encontraban los Jueces White, McKenna, Shiras y Gray, quienes sostenían que el gobierno de los Estados Unidos tiene poder para adquirir y poseer territorio sin incorporarlo inmediatamente a los Estados Unidos, y que el Congreso puede determinar cuándo el territorio adquirido ha llegado a un estado tal que es propio que entre a formar parte de la familia Americana; y que Puerto Rico, aunque no es un país extranjero en el sentido internacional, puesto que está sujeto a y bajo la soberanía de los Estados Unidos desde el tratado de cesión, continuó siendo extranjero para los Estados Unidos en el sentido doméstico porque no había sido incorporado a Estados Unidos y meramente pertenecía al mismo como una posesión. Estos criterios fueron defendidos con una riqueza de razonamientos y un ardor en la discusión dignos de la magnitud de la controversia, pero con el curioso resultado de que con la sentencia en los casos de De Lima y Dooley estuvieron conformes, aunque por razones totalmente distintas, los Jueces Brown, Harlan, Brewer, Peckham y el Juez Presidente; mientras que la del caso de Downes estaba sostenida por los Jueces Brown, White, Mc

Kenna, Shiras y Gray.   *   *   *   La "idea de incorporación" del
Juez White estaba destinada a prevalecer.   *   *   *   En el caso de
Hawaii v. Mankichi, en 1903, la garantía constitucional del juicio
por jurado se resolvió ser inaplicable a las islas de Hawaii, aprove-
chando la ocasión el Juez White por sí y por el Juez McKenna de
reiterar su criterio sostenido en Downes v. Bidwell, y disintiendo
como de costumbre los Jueces Fuller, Brewer, Harlan y Peckham.
Un año después vino el caso de Dorr v. The United States, en el cual
la opinión escrita por el Juez Day, que en el entretanto había en-
trado a formar parte del tribunal, sostuvo que la Constitución Fe-
deral no extendía el derecho de juicio por jurado, por su propia
fuerza y sin legislación, a las Islas Filipinas cedidas a Estados Uni-
dos por España pero no incorporadas a Estados Unidos por acción
del Congreso.   *   *   *   Finalmente, en el caso de Rasmussen v.
United States, surgió la cuestión con referencia a Alaska, y por fin
el Juez White, escribiendo la opinión de una evidente mayoría de
la Corte, tuvo oportunidad de repetir con autoridad el criterio que
siempre había mantenido.   *   *   *   El Juez Harlan, aunque con-
forme con la sentencia en el caso, enarboló su bandera en cuanto a
la cuestión principal y murió peleando hasta lo último.   Años más
tarde, hablando de la controversia, el Juez Presidente White dió
muestras de lo arraigado de su convicción cuando dijo: 'Pero, se-
ñor, si no hubiéramos resuelto lo que resolvimos este país hubiera
sido menos que una Nación.' El toque final a la doctrina de in-
corporación fué dado en el caso de Puerto Rico v. Tapia, en 1918,
cuando la corte resolvió que los derechos garantizados por la Cons-
titución podían ser negados por el Congreso a un territorio no incor-
porado aún cuando el mismo Congreso hubiera concedido la ciuda-
danía de Estados Unidos a los habitantes del territorio." The Su-
preme Court in United States History, vol. 3, págs. 429–33.

Cuando la obra que acabamos de citar fué editada, aún
no había sido resuelto el caso de *Balzac, supra.* En el caso
de Tapia como en el de Muratti, 245 U. S. 639, la Corte Su-
prema no emitió opinión dejando así un vacío en aquellos
que firmemente creyeron y expusieron su criterio con toda
amplitud, (*Muratti* v. *Foote,* 25 D.P.R. 568), que al otor-
garse la ciudadanía americana en forma colectiva a los
puertorriqueños, todos los requisitos exigidos por la juris-
prudencia de la Corte Suprema se habían cumplido y Puerto
Rico debía considerarse como un territorio incorporado de-

finitivamente al seno de la Unión. Parece que el Tribunal se dió cuenta de ello y cuando William Howard Taft, ex-Presidente de los Estados Unidos, ex-Secretario de la Guerra y ex-Gobernador de Filipinas, entró a formar parte de él como Chief Justice, en la primera oportunidad que se le presentó emitió una opinión en la que se estableció el criterio de la Corte de modo inequívoco, como sigue:

"Ahora tenemos que investigar si aquella parte de la Enmienda Sexta a la Constitución que exige que en todos los procesos criminales el acusado gozará del derecho a un juicio rápido y público, por un jurado imparcial del estado y distrito en que se hubiere cometido el delito, el cual distrito deberá haber sido previamente fijado por ley, es o no aplicable a Puerto Rico. Otra disposición sobre la materia se encuentra en el Artículo III de la Constitución, que dispone que el juicio por todos los delitos, excepto en casos de residencia, será por jurado; y que tal juicio se celebrará en el Estado en que dichos delitos hubieren sido cometidos; pero que cuando el delito no fuere cometido dentro de ningún Estado, el juicio se celebrará en el lugar o lugares que el Congreso por ley haya dispuesto. La Séptima Enmienda a la Constitución dispone que en las acciones del derecho común en que la cuantía exceda de veinte dólares, se reservará el derecho a juicio por jurado. Está bien establecido que estas disposiciones sobre juicio por jurado en casos criminales y civiles son aplicables a los territorios de los Estados Unidos. Webster v. Reid, 11 How. 437, 460; Reynolds v. United States, 98 U.S. 145, 167; Callan v. Wilson, 127 U.S. 540, 556; American Publishing Co. v. Fisher, 166 U.S. 464; Thompson v. Utah, 170 U.S. 343, 347; Capital Traction Co. v. Hof, 174 U.S. 1; Black v. Jackson, 177 U.S. 349; Rassmussen v. United States, 197 U.S. 516, 528; Gurvich v. United States, 198 U.S. 581. Pero está tan claramente establecido que no son aplicables a territorio perteneciente a los Estados Unidos que no ha sido incorporado a la Unión. Hawaii v. Mankichi, 190 U.S. 197; Dorr v. United States, 195 U.S. 138, 145. También fué establecido en Downes v. Bidwell, 182 U.S. 244, y reafirmado en Dorr v. United States, 195 U.S. 138, que ni las Filipinas ni Puerto Rico son territorio que ha sido incorporado a la Unión o ha venido a formar parte de Estados Unidos; como distinto de una mera pertenencia al mismo; y que las leyes para dar temporalmente un gobierno a las Filipinas, 32 Stat. 691, y a Puerto Rico, 31 Stat. 77, no surtían tal efecto. Los Casos Insulares revelaron gran diversidad de opinión en esta corte

en cuanto al *status* constitucional del territorio adquirido por el Tratado de París que puso término a la guerra hispano-americana, pero el Caso de Dorr demuestra que la opinión de la mayoría escrita por el Juez Sr. White en Downes v. Bidwell, ha venido a ser ley para la corte. La conclusión de esta Corte en el Caso de Dorr, p. 149, fué como sigue:

'' 'Llegamos a la conclusión de que el poder de gobernar territorio, implícito en el derecho a adquirirlo, conferido al Congreso en el Artículo IV, sección 3 de la Constitución, a cualesquiera otras limitaciones a que esté sujeto, cuyo alcance habrá de ser fijado a medida que surjan las cuestiones, no exige de ese cuerpo que promulgue, para territorio cedido y no hecho parte de los Estados Unidos por acción del Congreso, un sistema de leyes que incluya el derecho a juicio por jurado, y que la Constitución, sin legislación y por su propia fuerza, no lleva tal derecho a aquel territorio que se encuentra en esas condiciones.'

''La cuestión ante nosotros es, por tanto, si el Congreso, después de la Ley Foraker de abril 12, 1900, c. 191, 31 Stat. 77, ha promulgado ley alguna incorporando a Puerto Rico a la Unión. La representación del demandante en error en su alegato da una larga lista de leyes, a que nos referiremos más adelante, que insiste dicha parte son indicativas de la intención de hacer a la Isla una parte de los Estados Unidos, pero principalmente se basa en la Ley Orgánica de Puerto Rico, de marzo 2, 1917, c. 145, 39 Stat. 951, conocida por Ley Jones.

''La ley se titula 'Ley para proveer un gobierno civil para Puerto Rico, y para otros fines.' Por su título no indica que tenga por objeto incorporar la Isla a la Unión. No contiene cláusula alguna que declare tal fin o efecto. Aunque esto no es concluyente, tiende fuertemente a demostrar que el Congreso no tuvo tal intención. Pocas cuestiones han sido materia de tanta discusión y controversia en este país como el *status* del territorio que adquirimos de España en 1899. La división entre los partidos políticos con respecto al mismo, la diversidad de criterio entre los miembros de este tribunal sobre sus aspectos constitucionales, y el constante surgir de la cuestión en ambas cámaras del Congreso, hicieron fijar la atención de todos en las futuras relaciones entre este territorio adquirido y los Estados Unidos. Si el Congreso hubiera tenido la intención de dar el importante paso de cambiar el *status* que Puerto Rico tenía por el tratado incorporándolo a la Unión, es razonable suponer que lo hubiera declarado así claramente y no lo hubiera dejado a mera inferencia. Antes de que la cuestión se tornara crítica al finalizarse la guerra hispano-

americana, la distinción entre adquisición e incorporación no fué considerada importante, o por lo menos no había sido bien comprendida ni había dado lugar a mayor controversia. Antes de eso la intención del Congreso podría muy bien ser objeto de mera inferencia de varios actos legislativos; pero en estos tiempos la incorporación no puede presumirse en ausencia de declaración expresa o de una deducción tan fuerte que excluya cualquier otro juicio.

"Además, el artículo 2 de dicha ley está titulado 'Declaración de Derechos,' y en él están incluidas sustancialmente todas las garantías de la Constitución Federal excepto las relativas a acusación por un gran jurado en caso de delitos infamantes y al derecho de juicio por jurado en casos civiles y criminales. ¿Si fué la intención incorporar a Puerto Rico a la Unión por virtud de esta ley, la que entonces *ex proprio vigore* haría aplicable a la Isla toda la Declaración de Derechos de la Constitución, por qué se creyó necesario hacer para la Isla una Declaración de Derechos y cuidadosamente excluir de ésta el juicio por jurado? En los mismos comienzos de la ley se encuentra este sustituto de la incorporación y de la aplicabilidad de la Declaración de Derechos de la Constitución. Este es a nuestro juicio un argumento terminante contra la contención de los abogados del demandante en error.

"El artículo de la Ley Jones a que su representación nos llama más insistentemente la atención es el artículo 5. Dicho artículo en substancia declara que todas las personas que por la Ley Foraker fueron ciudadanos de Puerto Rico y ciertos otros residentes serán ciudadanos de los Estados Unidos, a menos que prefieran no convertirse en tales, y en este último caso declararán tal preferencia dentro de seis meses, después de lo cual perderán ciertos derechos políticos bajo el nuevo régimen. En el mismo artículo se confiere poder a la Corte de Distrito de los Estados Unidos para naturalizar separadamente a individuos pertenecientes a otras clases de residentes. En el margen transcribimos el artículo en su totalidad. De no estar afectada por las consideraciones antes enunciadas, quizás la declaración del artículo 5 sería fundamento para una inferencia como la que sostiene la representación del demandante en error, pero dentro de las circunstancias encontramos que tal declaración es perfectamente compatible con la no incorporación. Cuando los puertorriqueños dejaron de estar bajo el gobierno de España, perdieron la protección que ese gobierno les daba como súbditos del Rey de España, nombre con el que habían sido conocidos durante siglos. Al pasar bajo el dominio de los Estados Unidos tenían derecho a esperar un *status* que les diera derecho a la protección del nuevo soberano. En teoría y en derecho

la tenían como ciudadanos de Puerto Rico, pero éste era un *status* anómalo, o por lo menos lo parecía si se tiene en cuenta el hecho de que a aquellos que debían y prestaban fidelidad a las otras potencias mundiales se les daba el mismo nombre y *status* que a los que vivían en su país natal, en tanto en cuanto se refiere a la protección contra injusticias de naciones extranjeras. Vino a ser, por tanto, el anhelo de los puertorriqueños el ser ciudadanos americanos, y esta ley les confirió esa gracia. ¿Y qué derechos adicionales les dió? Les facultó para que viniendo a los Estados Unidos continentales y haciéndose residentes de cualquier estado pudieran allí disfrutar de todos los derechos civiles, sociales y políticos de cualquier otro ciudadano de los Estados Unidos. Un ciudadano de las Filipinas tiene que naturalizarse antes de poder adquirir residencia y votar en este país. Ley de junio 29, 1906, c. 3592, sec. 30, 34 Stat. 606. No así el puertorriqueño, de acuerdo con la Ley Orgánica de 1917.

"En Puerto Rico, sin embargo, el puertorriqueño no puede insistir en el derecho a juicio por jurado, salvo que sus propios representantes en su legislatura se sirvan concedérselo. El ciudadano de los Estados Unidos que vive en Puerto Rico no puede allí disfrutar del derecho a juicio por jurado en virtud de la Constitución Federal, más de lo que puede un puertorriqueño. Es el *situs* lo que determina la aplicación de la Constitución en materias tales como procedimiento judicial, y no el *status* de sus habitantes.

"Es cierto que a falta de otra evidencia en contrario una ley del Congreso o una disposición contenida en un tratado sobre adquisición de territorio, en que se declare una intención de conferir a los habitantes del nuevo territorio derechos políticos y civiles como ciudadanos americanos, puede muy bien interpretarse como una incorporación a la Unión, que es el caso de Louisiana y Alaska. Ese es uno de los fundamentos principales en que esta corte basó su conclusión de que Alaska había sido incorporado a la Unión, en el caso de Rasmussen v. United States, 197 U.S. 516. Pero el caso de Alaska era muy distinto al de Puerto Rico. Se trataba de un territorio enorme, de población muy escasa y que ofrecía oportunidad para la inmigración y establecimiento de ciudadanos americanos. Se hallaba, además, situado en el continente americano y a poca distancia de lo que entonces era Estados Unidos. No presentaba ninguna de las dificultades que la incorporación de las Filipinas y Puerto Rico presentan, una de las cuales es esta misma cuestión del juicio por jurado. A esas dificultades se refirió este tribunal en Dorr v. United States, 195 U.S. 138, 148, como sigue:

" 'Si el derecho a juicio por jurado fuera un derecho fundamental

existente dondequiera que se extiende la jurisdicción de los Estados Unidos, o si el Congreso, al redactar leyes para los territorios no contiguos pertenecientes a los Estados Unidos, estuviera obligado a establecer ese sistema mediante legislación afirmativa, la deducción sería que, sin consideración a las necesidades o capacidad del pueblo, el juicio por jurado y no en otra forma, debería desde luego quedar establecido, aunque el resultado fuera acarrear injusticias y provocar desórdenes más bien que contribuir a la ordenada administración de la justicia. * * * Además, si Estados Unidos hubiera de obtener por tratado la cesión de territorio con un sistema bien establecido de jurisprudencia en que es desconocido el juicio por jurado, pero que se rige por una forma ordenada y justa de enjuiciamiento al amparo de un código aceptable y consagrado por el tiempo, tendría entonces que pasarse por alto la preferencia del pueblo así como sus costumbres establecidas y obligársele a aceptar, antes de la incorporación a los Estados Unidos, un sistema de enjuiciamiento para ellos desconocido e inadecuado a sus necesidades. No creemos que al concedérsele poder al Congreso para dictar reglas para los territorios fuera la intención entorpecer su ejercicio con esta condición.'

''El sistema de jurados requiere ciudadanos avezados al ejercicio de las responsabilidades de los miembros de ese cuerpo. En los países que se rigen por el derecho común los siglos han servido de preparación para formar un concepto de la actitud imparcial que deben asumir los jurados. El sistema de jurados presupone un deber consciente de participación en la maquinaria de la justicia que es difícil a un pueblo no formado bajo un gobierno fundamentalmente popular comprender de momento. Uno de sus grandes beneficios consiste en la seguridad que da a los individuos de que ellos, como jurados presentes o probables, formando parte del sistema judicial del país, pueden impedir su uso arbitrario o su abuso. El Congreso ha creído que a un pueblo como los filipinos o los puertorriqueños, acostumbrado a un sistema judicial completo en que el jurado es desconocido, que vive en antiguas y compactas comunidades, con costumbres y conceptos políticos definidamente formados, debe permitírsele que determine por sí mismo cuándo y hasta dónde desea adoptar esta institución de origen anglosajón. De ahí el cuidado con que desde la época en que McKinley escribió su histórica carta a Root en abril de 1900, Public Laws, Philippine Commission, páginas 6-9, Ley de julio 1, 1902, c. 1369, 32 Stat. 691, 692, referente a la clase de gobierno que había de establecer la Comisión Filipina en dichas Islas, hasta la ley de 1917 confiriendo una carta orgánica a Puerto Rico, los Estados Unidos han sido por un lado liberales concediendo a las islas adquiridas

por el Tratado de París la mayor parte de las garantías constitucionales americanas y por otro han tenido buen cuidado de evitar la implantación forzosa de un sistema de jurados en un país de origen español y gobernado por el derecho civil, antes de que el mismo país lo desee.   No podemos ver intención alguna de abandonar esta política en el·hecho de hacer ciudadanos americanos a los puertorriqueños, explicado como ello está por el deseo de ponerlos como individuos en igualdad de condiciones que los ciudadanos del continente americano, de asegurarles una protección más eficaz contra el resto del globo, y de darles una oportunidad, si lo desean, de venir a Estados Unidos propiamente dicho y sin necesidad de naturalización disfrutar aquí de todos los derechos políticos y de otras clases.

"No necesitamos entrar en otra consideración que requiere que no deduzcamos ligeramente, de actos fácilmente explicables por otros motivos, una intención de incorporar a la Unión estas comunidades distantes que se hallan en medio del océano y tienen origen y habla diferentes a los del pueblo del continente.   La incorporación siempre ha sido un paso, y paso importante, hacia la estadidad.   Sin en lo más mínimo insinuar una opinión sobre la sabiduría de tal política, pues no es de nuestra incumbencia, es razonable suponer que cuando se da tal paso se comienza y se da por el Congreso deliberadamente y mediante una clara manifestación de intento, y no se deja a mera inferencia o interpretación.

"La representación del demandante en error también se funda en la organización de una Corte de Distrito de los Estados Unidos en Puerto Rico, en la concesión del derecho de revisión de las sentencias de la Corte Suprema de Puerto Rico cuando en el caso está envuelta la Constitución de los Estados Unidos, en la concesión estatutoria de que jóvenes puertorriqueños puedan estudiar en las academias de West Point y Annapolis, en la venta autorizada de sellos de los Estados Unidos en la Isla, y en la extensión a Puerto Rico, en una forma u otra, de las leyes federales de rentas, navegación, inmigración, bancos, quiebra, responsabilidad de patronos, aparatos de seguridad, extradición, y censo.   Ante las consideraciones arriba enunciadas, ninguna de éstas ni todas justas pueden servir de base para la conclusión a que se nos quiere llevar.

"La Corte de Distrito de los Estados Unidos no es una verdadera corte de los Estados Unidos establecida bajo el Artículo III de la Constitución para administrar el poder judicial de los Estados Unidos que por dicho artículo se establece.   Fué creada por virtud de la soberana autoridad congresional, conferida por el Artículo IV, sec. 3, de dicho documento, para hacer todas las reglas y reglamentos

necesarios para los territorios pertenecientes a los Estados Unidos. La semejanza de su jurisdicción a la de una verdadera corte de los Estados Unidos en cuanto ofrece oportunidad a los no residentes para acudir a un tribunal libre de influencia locales, no altera su naturaleza de una mera corte territorial. Ni tampoco es de peso alguno en esta discusión el reconocimiento legislativo de que en Puerto Rico pueden surgir en litigio cuestiones constituciones. La Constitución de los Estados Unidos está en vigor en Puerto Rico como lo está donde y cuando quiera que se ejercita el poder soberano de ese gobierno. Esto no sólo ha sido admitido sino expresado enfáticamente por este tribunal en todas sus declaraciones autorizadas relativas a las cuestiones que surgieron en los Casos Insulares, y especialmente en los casos de Downes v. Bidwell y de Dorr. La Constitución, sin embargo, contiene concesiones de poder y limitaciones que por la naturaleza de las cosas no son aplicables siempre y en todas partes, y la verdadera cuestión en los Casos Insulares no fué si la Constitución era extensiva a las Filipinas o a Puerto Rico desde que entramos allí, sino cuáles de sus disposiciones eran aplicables a manera de limitación al ejercicio del poder ejecutivo y el legislativo con respecto a nuevas condiciones y exigencias. Las garantías de ciertos derechos personales fundamentales declarados por la Constitución, como por ejemplo la de que ninguna persona será privada de la vida, libertad o propiedad sin el debido procedimiento de ley, eran de entera aplicación en las Filipinas y Puerto Rico desde el primer momento, y como esta garantía ha sido en nuestro propio país una de las más prolíficas en litigios, naturalmente hubo que proveer para una serie semejante de controversias en Puerto Rico. Tan es así que se ha provisto para la revisión de cuestiones constitucionales en apelación y auto de error de la Corte Suprema de las Filipinas, país que indiscutiblemente no está incorporado a la Unión. Código Judicial, sec. 248.

"En conjunto, por tanto, no encontramos rasgos en la Ley Orgánica de Puerto Rico de 1917 de los cuales podamos inferir la intención del Congreso de incorporar a Puerto Rico a los Estados Unidos con los resultados consiguientes.

"Esta corte ha considerado sustancialmente las mismas cuestiones aquí presentadas en los dos casos de Puerto Rico v. Tapia y Puerto Rico v. Muratti, 245 U.S. 639. En el primero la cuestión era si una persona acusada de cometer un homicidio (delito grave) unos doce días después de aprobada la Ley Orgánica de 1917, podía ser llevado a juicio sin la acusación de un gran jurado según exige la Quinta Enmienda a la Constitución. La Corte de Distrito de los Estados

Unidos para Puerto Rico en procedimiento de *habeas corpus* sostuvo que no se le podía detener y lo puso en libertad.   En el otro caso el delito grave imputado se decía haberse cometido antes de la aprobación de la Ley Orgánica, pero el proceso fué comenzado después. En él la Corte Suprema de Puerto Rico sostuvo que por virtud de la Ley Orgánica era necesaria la acusación de un gran jurado.   Esta corte revocó tanto la sentencia de la Corte de Distrito en el caso de Tapia como la de la Corte Suprema en el de Muratti, sosteniendo necesariamente que la Ley Orgánica no había incorporado a Puerto Rico a los Estados Unidos.   Estos casos fueron resueltos sin opinión. Los abogados en los casos presentes nos han pedido que expongamos más ampliamente los puntos de vista sobre el efecto de la Ley Orgánica de 1917 en esta cuestión y así lo hemos hecho."

¿Constituye el derecho al sufragio un derecho personal fundamental como el de que nadie puede ser privado de la vida, libertad o propiedad sin el debido procedimiento de ley, que deba entenderse en vigor en Puerto Rico en la forma que prescribe la enmienda constitucional de que se trata, o es uno de aquellos derechos que como el del juicio por jurado sólo regirá cuando expresamente lo extienda el Congreso a la Isla, o lo otorgue la Legislatura del territorio?

A nuestro juicio, cualquiera que haya sido o pueda seguir siendo la opinión personal de algunos de los jueces de esta Corte, ese es el criterio que debe adoptarse para resolver la cuestión envuelta en estos recursos de *mandamus.* Y aplicándolo nos vemos obligados a resolver que el derecho al sufragio no es un derecho personal fundamental y por tanto que la enmienda en la forma en que aparece redactada no rige en Puerto Rico.

La propia Corte Suprema de los Estados Unidos en el caso de *Downes* v. *Bidwell, supra,* se expresó así:

"Sugerimos, sin que sea la intención resolverlo, que puede existir una distinción entre ciertos derechos naturales asegurados en la Constitución mediante la prohibición de que sean restringidos, y lo que pudiéramos llamar derechos artificiales o jurídicos, que son peculiares a nuestro sistema de jurisprudencia.   En la primera clase está in-

cluído el derecho a tener una opinión religiosa propia y a expresarla libremente, o, como algunas veces se le llama, el derecho de adorar a Dios de acuerdo con los dictados de nuestra propia conciencia; el derecho a la libertad personal y a la propiedad individual; el derecho a la libertad de palabra y de la prensa; el derecho al libre acceso a las cortes de justicia, al debido procedimiento de ley, y a la igual protección de las leyes; el derecho a estar garantizado contra registros y allanamientos injustificados, así como también contra castigos crueles e inusitados, y a aquellas otras inmunidades que son indispensables a un gobierno libre. De la segunda clase son los derechos a la ciudadanía, al sufragio (Minor vs. Happersett, 21 Wall. 162), y a las formas determinadas de procedimiento expresadas en nuestra Constitución, que son peculiares a la jurisprudencia anglosajona, y algunas de las cuales los Estados habían considerado innecesarios para la adecuada protección de los individuos.'' 182 U.S. 244, 282.

''El derecho del sufragio, por lo tanto,'' como dice el Dr. Lieber, citado por la Corte Suprema de Indiana en *Gougar* v. *Timberlake et al.,* ''es un derecho noble, o debe serlo; pero no es un derecho natural. Es un derecho político hacia el cual la Providencia ha encaminado al hombre en el curso progresivo de la historia.'' 46 N. E. 340. Véanse además los casos de *State ex rel Bickett* v. *Knight,* 85 S. E. 418; *Shaw* v. *City Council of Marshalltown,* 104 N. W. 1121, y *United States* v. *Antony,* 24 Fed. Cases, 830.

No habiendo llegado aún el momento en que la ley reconozca a la mujer el derecho a votar en esta Isla, *las peticiones de mandamus deben ser declaradas sin lugar.*