BALLESTER HERMANOS, peticionario, *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, ETC., demandado, RAFAEL A. BUSCAGLIA, TESORERO DE PUERTO RICO, interventor.

Núm. 63.—*Sometido:* Enero 28, 1946. *Resuelto:* Julio 26, 1946.

*J. J. Ortiz Alibrán*, abogado de la peticionaria; *Hon. Procurador General E. Campos del Toro, y J. B. Fernández Badillo*, abogado éste de la División de Contribuciones y Litigios Especiales del Departamento de Justicia, abogados ambos del interventor, Tesorero de Puerto Rico, querellado en el pleito principal.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

¿Tiene poder Puerto Rico para imponer contribuciones sobre la propiedad a mercancía importada que, a la fecha de la

imposición contributiva, estaba depositada en un barco extranjero surto en la bahía de San Juan y no se había entregado aún por las autoridades de aduana al importador?

Ballester Hermanos importó a Puerto Rico procedente de la Argentina mercancía valorada en $118,250 que arribó al puerto de San Juan en un barco argentino el 13 de enero de 1943. El Tesorero exigió el pago de contribuciones sobre la propiedad por un valor de $3,382.12 correspondientes al año fiscal 1943-44, impuestas sobre esta mercancía. La contribuyente impugnó esta reclamación ante el Tribunal de Contribuciones, ante el cual las partes estipularon que Ballester Hermanos había "garantizado el pago de la mercancía" y había "aceptado giros en pago de parte de la mercancía con anterioridad al 15 de enero. . . pero que no pudo ser levantada debido a trámites aduaneros. . . hasta que las autoridades de aduana dieron el 'release' de acuerdo con las leyes federales. . . el 18 ó 20 de enero de 1943." El caso se encuentra ante nos mediante *certiorari* para revisar la decisión del Tribunal de Contribuciones sosteniendo al Tesorero.(¹)

## I.

■ Alega la contribuyente que las contribuciones aquí impuestas la privan de su propiedad sin el debido procedimiento de ley, en violación de la Sección 2 de lá Carta Orgánica, 48 U.S.C. sec. 737.(²)

---

(¹)Por los motivos expuestos en *Island Needlework Inc.* v. *Tribunal de Contribuciones,* 65 D.P.R. 723, se declara sin lugar la moción del Tesorero para que se desestime el recurso por falta de jurisdicción.

(²)La cláusula dél debido procedimiento de la Enmienda Quinta limita el poder del Congreso para legislaar sobre Puerto Rico. *People of Puerto Rico* v. *Eastern Sugar Associates et al.,* 156 F.2d 316, resuelto el 28 de junio de 1946; *Cases* v. *United States,* 131 F.2d 916 (C.C.A. 1, 1942). *A fortiori,* la legislatura insular, que es una agencia del Congreso, tiene sus poderes limitados de igual manera por la Enmienda Quinta. *Farrington* v. *Tokushige,* 273 U.S. 284, 299; *Thornberg* v. *Jorgensen,* 60 F. 2d 471, 473 (C.C.A. 3, 1932); *Soto* v. *United States,* 273 F. 628 (C.C.A. 3, 1921). Cualquiera insinuación en contrario que pudiera desprenderse de nuestra opinión en *Pueblo* v. *Central Aguirre Associates,* 59 D.P.R. 401, 403-4, necesariamente fué dejada sin efecto por el caso de *Cases.* Sin embargo, el problema no tiene aquí importancia práctica alguna, ya que

Si Ballester Hermanos hubiera entrado en posesión de la mercancía dentro de Puerto Rico en o antes del día contributivo, o sea el 15 de enero, la cuestión sobre quién es el dueño de la mercancía sería irrelevante: aun de no ser el verdadero dueño de ellas estaría obligada bajo el artículo 293 del Código Político y el caso de *Island Needlework, Inc.* v. *Tribunal de Contribuciones,* 65 D.P.R. 727, a pagar la contribución y gestionar su reembolso del verdadero dueño. Pero como la mercancía no estaba en posesión de la contribuyente el día contributivo, el Tesorero tiene que recurrir al artículo 297 del Código Político para sostener esta contribución.

El artículo 297 dispone ''Que todos los bienes muebles existentes en o fuera de Puerto Rico, serán tasados e incluídos en el reparto de contribuciones a nombre de su dueño respectivo... el día quince de enero. . .''. Bajo el artículo 297 es por lo tanto importante determinar la identidad del dueño de la propiedad el 15 de enero. Véase *Varcárcel* v. *Sancho Bonet, Tes.,* 61 D.P.R. 213. Pero la estipulación es tan general que vierte poca luz en cuanto a si el título de la mercancía pasó del vendedor al contribuyente antes del 15 de enero. Resolver

la cláusula del debido procedimiento del Acta Orgánica está redactada en el mismo lenguaje que la de la Enmienda Quinta. *People of Puerto Rico* v. *Eastern Sugar Associates,* supra; *San Juan Trading Company* v. *Sancho,* 114 F.2d 969, 971 (C.C.A. 1, 1940); *Sancho* v. *Bacardí Corp. of America,* infra, pág. 64.

La cuestión de si está envuelta el Acta Orgánica o la Enmienda Quinta ha sido discutida también en los casos sobre jurisdicción federal y la aplicación de la doctrina de ''ineludiblemente errónea''. *Fitzimmons* v. *León,* 141 F.2d 886 (C.C.A. 1, 1944); *Gallardo* v. *González,* 143 F.2d 947 (C.C.A. 1, 1944); *Buscaglia* v. *District Court of San Juan,* 145 F.2d 274 (C.C.A. 1, 1944), con el cual compárese *Puerto Rico* v. *Rubert Hermanos, Inc.,* 309 U.S. 543, 549-50; *Pueblo* v. *Central Aguirre Associates,* 59 D.P.R. 401-403; *Pueblo* v. *Henneman,* 60 D.P.R. 59; *Pueblo* v. *South P. R. Sugar Co.,* 54 D.P.R. 131; *Gobierno de la Capital* v. *Consejo Ejecutivo,* 63 D.P.R. 434, 460; *Tugwell* v. *Corte* 64 D.P.R. 220, 236-37, escolio 21. Véanse *De Castro* v. *Board of Com'rs of San Juan,* 322 U.S. 451, y *Buscaglia* v. *District Court of San Juan,* supra. No está dentro del alcance de esta opinión el examen de estas cuestiones; pero para unas discusiones cuidadosas de estos problemas, véanse Francisco Ponsa Feliú, I La Toga, núms. 5-6, y Alberto Picó Santiago, Jurisdicción Federal en Puerto Rico, VIII Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico, 305, 310-22.

ese problema requeriría la sustanciación de varias cuestiones de hecho y de derecho. Véanse *Ronrico Corp.* v. *Commissioner*, 44 B.T.A. 1130 (1941; 1 Williston *on Sales*, 2da ed., sec. 261, pág. 525; Tepper and Loterman, *The Federal Tax Inducements to Western Hemisphere Trade*, 31 Cornell L.Q. 205, 221–25; 23 Taxes 1120–24; artículo 1339, Código Civil de Puerto Rico, ed. de 1930; *West India Oil Co. (P.R.)* v. *Sancho Bonet, Tes.*, 54 D.P.R. 732, 741–45, confirmado, 108 F.2d 144, 147; *Varcárcel* v. *Sancho Bonet, Tes.*, supra; *Hooven & Allison Co.* v. *Evatt*, 324 U.S. 652–664. Sin embargo, la contribuyente no arguye en este caso que Ballester Hermanos no poseyera la mercancía el día contributivo; descansa su caso en la teoría de que aun cuando así hubiera sido, no era responsable de esta contribución. Supondremos por lo tanto, como hizo el Tribunal de Contribuciones, que la contribuyente era dueña de la mercancía para el día 15 de enero.

Bienes muebles tangibles propiedad de un domiciliado en Puerto Rico pueden ser tasados válidamente de conformidad con el artículo 297 aun cuando dichos bienes estén fuera de Puerto Rico. Esto incluiría los bienes pertenecientes a Ballester Hermanos que, como sociedad mercantil organizada bajo las leyes de Puerto Rico, es una entidad doméstica. Solamente de estar radicados dichos bienes permanentemente fuera de Puerto Rico—ya sea en uno de los estados de la Unión o en un país extranjero—impediría esta contribución la cláusula del debido procedimiento. *Sancho* v. *Humacao Shipping Corp.*, 108 F.2d 157 (C.C.A. 1, 1939); *Unión Transit Co.* v. *Kentucky*, 199 U.S. 194; *Southern Pacific Co.* v. *Kentucky*, 222 U.S. 63; *Gromer* v. *Standard Dredging Co.* 224 U.S. 362, 372; véase *Buscaglia* v. *Bowie*, 139 F.2d 294, 295 (C.C.A. 1, 1943). No estamos convencidos de que *Northwest Airlines* v. *Minnesota*, 322 U. S. 292, cambió esta doctrina. Véanse 153 A.L.R. 264; 57 Harv. L. Rev. 1097; 29 Cornell L.Q. 531; 38 Ill. L. Rev. 210.

La dificultad con la posición de la contribuyente estriba en que la mercancía no se encontraba permanentemente fuera de Puerto Rico. Arguye que la mercancía que se encuentra en la bahía de San Juan y que la aduana no ha entregado aún, no ha adquirido un *situs* tributable en Puerto Rico. Pero hasta donde se aplica la cláusula del debido procedimiento,([3]) la única barrera contra la tributación por Puerto Rico de propiedad tangible perteneciente a sus domiciliados, es la radicación permanente de dicha propiedad fuera de la isla. *Sancho* v. *Humacao Shipping Corporation,* supra, pág. 159 *Northwestern Airlines* v. *Minnesota,* supra, págs. 294-300; 311-12; *Gromer* v. *Standard Dredging Co.,* supra, pág. 376. Y la mercancía que está pendiente de descarga en la bahía de San Juan, ya esté o no técnicamente dentro de Puerto Rico a los fines de importación o a otros fines, no puede decirse que esté permanentemente radicada fuera de Puerto Rico. Por tanto la cláusula del debido procedimiento no impide las contribuciones aquí impuestas.

## II

Arguye la contribuyente que la tributación local de esta mercancía infringe la cláusula de comercio de la Constitución.([4]) La cláusula de comercio tiene dos propósitos: constituye una fuente de poderes para el Congreso; también es una limitación al poder estatal. *Prudential Insurance Co.* v. *Benjamín,* ——U.S.——, resuelto el 3 de junio de 1946; *McGoldrick* v. *Berwind-White Co.,* 309 U.S. 33, 45. Pero ninguno de estos dos conceptos afecta a Puerto Rico. Toda vez que el Congreso tiene poderes plenarios para legislar sobre Puerto

---

([3])Los conceptos ''debido procedimiento'' y ''cláusula de comercio'', si bien no se pueden siempre separar definidamente y algunas veces se traslapan, no son idénticos. *Harvester Co.* v. *Dept. of Treasury,* 322 U.S. 340, 353, opinión concurrente; *Robertson* v. *The People of the State of California,* __ U.S. ____, resuelto el 3 de junio de 1946, escolio 6.

([4])El Artículo I, Sección 8, Cl. 3 concede facultad al Congreso ''Para regular el comercio con las naciones extranjeras y el que se hace de Estado a Estado . . .''.

Rico en virtud de la cláusula territorial de la Constitución,[5] dicho poder no está restringido por las limitaciones de la cláusula de comercio. *Hooven & Allison Co.*, v. *Evatt, supra,* págs. 673-4; *Cases* v. *United States,* 131 F.2d 916, 923 (C.C.A. 1, 1942). De igual manera, la cláusula de comercio, contrario al efecto que tiene sobre el poder de las legislaturas estatales, no restringe el poder de la legislatura insular, ya que la cláusula de comercio "no es extensiva a Puerto Rico". *Lugo* v. *Suazo,* 59 F.2d 386, 390 (C.C.A. 1, 1932); *Sancho* v. *Bacardi Corporation of America,* 109 F.2d 57, 62-63 (C.C.A. 1, 1940), revocado por otros motivos, 311 U.S. 150; véase *Porto Rico Tax Appeals,* 16 F.2d 545, 549 (C.C.A. 1, 1927), revocado por otros motivos, 275 U.S. 56.[6]

Pero aun si supusiéramos que la cláusula de comercio se aplica y restringe el poder de la legislatura insular para imponer contribuciones,[7] no podemos convenir con la contención de la contribuyente de que la propiedad ya transportada de un estado a otro está inmune, bajo la cláusula de comercio, a contribuciones locales en el estado a que va destinada siempre y cuando que permanezca en el paquete original. La doctrina del paquete original, como veremos en la parte III, ha permanecido inalterada bajo la cláusula de importación de la Constitución con respecto a importaciones de un país extranjero a Estados Unidos. Pero a pesar de los antiguos casos en contrario, la regla actual es que la doctrina del paquete original no puede ser invocada bajo la cláusula de comercio para ata-

---

[5] El Artículo IV, Sección 3, Cl. 2 dispone que "El Congreso podrá disponer del territorio o de cualquiera otra propiedad perteneciente a los Estados Unidos y dictará sobre ellos cuantas leyes y reglamentos considere necesarios . . .".

[6] De así elegirlo, el Congreso podría hacer aplicable a Puerto Rico la cláusula de comercio, a los fines de limitar el poder de la Asamblea Legislativa Insular. Véanse 48 U.S.C. Sección 495; *Inter-Island Steam Nav. Co.* v. *Territory of Hawaii,* 96 F.2d 412, 417, confirmado en 305 U.S. 306; XLV Col. L. Rev. 927, 929-930, nota 11.

[7] En *West India Oil Co.* v. *Sancho,* 108 F.2d 144, 147, la Corte de Circuito hizo una suposición similar a la nuestra en dicho caso y en el de *Island Needlework Inc.* v. *Tribunal de Contribuciones,* 65 D.P.R. 727.

car contribuciones estatales. *Woodruff* v. *Parham,* 8 Wall, 123; *Brown* v. *Houston,* 114 U.S. 622; *American Steel & Wire Co.* v. *Speed,* 192 U.S. 500, 521; *Sonneborn Bros.* v. *Cureton,* 262 U.S. 506, 508–13; *Baldwin* v. *G. A. F. Seeling,* 294 U.S. 511, 526–27; *McGoldrick* v. *Berwind White Co.,* 309 U.S. 33, 51–53, nota 10; *West India Oil Co.* v. *Domenech,* 311 U.S. 20, 27; *Hooven & Allison Co.* v. *Evatt,* 324 U.S. 652, 665–66; *Washington Chocolate Co.* v. *King County,* 152 P.2d 981, 990–1 (Wash., 1944); 58 Harv. L. Rev. 858, 868–70.

La mercancía que transita en el comercio interestatal no está por tanto protegida contra contribuciones locales sobre la propiedad después que ha arribado al estado a que va destinada simplemente porque todavía se halle en el paquete original. Sin embargo, la cláusula de comercio provee inmunidad contra tales contribuciones locales, aun por el estado donde está domiciliado el dueño, si la mercancía está todavía en tránsito. *Bacon* v. *Illinois,* 227 U.S. 504, 511–14; *Kelley* v. *Rhoads,* 188 U.S. 1; *McGoldrick* v. *Berwind-White Co.,* 309 U.S. 33, 45–47; 57 Harv.L.Rev. 1097; *General Paint Corporation* v. *Tesorero,* 1 D.T.C. 467. [8]

Se estima que la mercancía está todavía en tránsito si su estacionamiento es un incidente necesario del medio de transportación elegido. *Champlain Co.* v. *Brattleboro,* 260 U.S. 366; *Carson Petroleum Co.* v. *Vial,* 279 U.S. 95. Pero pierde su inmunidad y viene a estar sujeta a una contribución local sobre la propiedad que no sea discriminatoria cuando se estaciona en el estado que la tasa para beneficiarse de una ventaja local independiente. *Island Needlework Inc.* v. *Tribunal de Contribuciones,* 65 D.P.R. 727; *Bacon* v. *Illi-*

---

[8] Nuestro Tribunal de Contribuciones aparentemente resolvió a la pág. 468 del caso de la *General Paint* que constituía una violación de la cláusula de comercio el que Puerto Rico impusiera contribuciones sobre la propiedad a mercancía que estaba en tránsito de un estado a Puerto Rico para el día contributivo. Pero toda vez que opinamos que la cláusula de comercio no se aplica a Puerto Rico, de haber llegado ante este Tribunal, dicho caso hubiera tenido que ser resuelto, ya fuere a favor o en contra de la contribuyente, sobre algún otro punto.

*nois*, supra; *Susquehanna Coal Co.* v. *South Amboy*, 228 U.S. 665; *Minnesota* v. *Blasius*, 290 U.S. 1; *Federal Compress Co.* v. *McLean*, 291 U.S. 17; 57 Harv.L.Rev. 1097.([9]) *Cf.* las autoridades citadas al calce que demuestran "la disminución progresiva de protección que antes prevalecía del comercio interestatal contra varias clases de contribuciones estatales. . .", 58 Harv. L. Rev. 858.([10])

Suponemos, sin decidirlo, que si esta mercancía se hubiera traído a Puerto Rico de los Estados Unidos y el 15 de enero todavía se encontrase en la bahía de San Juan en el barco en que llegó, se consideraría que la mercancía se había detenido en Puerto Rico para beneficiarse de una ventaja local independiente y por tanto estaría sujeta en dicho día a nuestra contribución sobre la propiedad, hasta donde concernía a la cláusula de comercio. *Cf. Gromer* v. *Standard Dredging Co.*, supra. Pero mercancía importada de un país extranjero que está en un barco en la bahía de San Juan pero que todavía no se ha entregado por la aduana para ser des-

---

([9])Esta nota en el Harvard Law Review indica a las págs. 1097–98 que tales "beneficiosas pausas pueden exponer a los cargamentos a más de una contribución estatal sobre la propiedad en un solo período contributivo de existir diferentes días contributivos en los diversos estados. La imposición de contribuciones por más de un estado es posible de igual manera si se impusiera una contribución en el estado de origen antes de que la mercancía empiece a transitar y una contribución en el estado a donde va destinada una vez que el viaje termina. En contraste con tales posibles contratiempos existe una posibilidad favorable para bastante propiedad consumible que viaja en escapar completamente de tal contribución, ya que la contribución sobre la propiedad se impone una vez al año. En muchos casos la mercancía ha escapado la contribución 364 veces antes de quedar sujeta a una sola contribución."

([10])*The Prudential Insurance Co.* v. *Benjamín*, supra, nota 20, comentado con anterioridad a la decisión en *Tye, The Premium Tax Cases*, 1 Tax. L. Rev. 259; *McLeod* v. *Dilworth Co.*, 322 U.S. 327; *General Trading Co.* v. *Tax Comm'n*, 322 U.S. 335; *Harvester Co.* v. *Dept. of Treasury*, 322 U.S. 340; *Henneford* v. *Silas Mason Co.*, 300 U.S. 577; *McGoldrick* v. *Berwind-White Co.*, 309 U.S. 33; *Richfield Oil Corp.* v. *State Board of Equalization*, infra; 57 Harv. L. Rev. 1086; Lockhart, *The Sales Tax in Interstate Commerce*, 52 Harv. L. Rev. 617, *State Tax Barriers to Interstate Trade*, 53 Harv. L. Rev. 1253, *Gross Receipts Taxes on Interstate Transportation and Communication*, 57 Harv. L. Rev. 40; Powell, *New Light on Gross Receipt Taxes*, 53 Harv. L. Rev. 909; 58 Harv. L. Rev. 858, 870, nota 48; 58 Harv. L. Rev. 1072.

cargada en Puerto Rico, muy bien puede estar en una situación diferente.([11]) Sin embargo, no es necesario que examinemos esta cuestión en vista de las conclusiones a que llegamos en las partes IV y VI.

## III

Desde el caso de *Brown* v. *Maryland,* 12 Wheat. 419, al de *Hooven & Allison Co.* v. *Evatt,* 324 U.S. 652, la doctrina ha sido al efecto de que bajo la cláusula de importación de la Constitución([12]) la inmunidad a contribuciones estatales de la mercancía importada "sobrevive a su arribo a este país y continúa hasta que es vendida, removida de su paquete original o puesta al uso para el cual fué importada." *Hooven & Allison Co.* v. *Evatt,* supra, pág. 657; *Washington Chocolate Co.* v. *King County,* 152 P.2d 981 (Wash., 1944). ([13]) En este caso ninguno de estos tres eventos había sucedido para el día contributivo. Por tanto, esta mercancía importada estaba inmune a nuestra contribución sobre la propiedad el 15 de enero, siempre y cuando que (1) la cláusula de importación se aplique a Puerto Rico, y (2) el Congreso no haya consentido a la contribución.

([11])Esta mercancía estaba en comercio extranjero más bien que interestatal. Podría argüirse que el poder del Congreso sobre comercio extranjero es más amplio bajo la cláusula de comercio que su poder sobre comercio interestal; y que en su consecuencia los casos que liberan los estatutos locales contributivos de las prohibiciones de la doctrina del paquete original sólo son aplicables a comercio interestatal, mientras que el comercio extranjero continúa siendo gobernado por dicha doctrina. *Cf. McGoldrick* v. *Gulf Oil Corp.,* 309 U.S. 414 428; *Board of Trustees* v. *U.S.,* 289 U.S. 48, 58. Pero aquí ésta es una cuestión académica: cualquiera que pueda ser la regla en cuanto a la aplicabilidad de la doctrina del paquete original a comercio extranjero bajo la cláusula de comercio, esta doctrina todavía sigue siendo la ley sobre el comercio extranjero en virtud de la cláusula de importación de la Constitución. Véase la parte III; *cf.* la VI.

([12])El Artículo I, Sección 10, Cl. 2 de la Constitución dispone que "Ningún Estado podrá, sin el consentimiento del Congreso, imponer sobre las importaciones o exportaciones contribución ni derecho alguno . . . ".

([13])Aun los cuatro jueces que disintieron en el caso de *Hooven* sobre este punto admiten que la doctrina del paquete original (pág. 688) "ha sido, y todavía es, la regla general de esta Corte, en relación con las importaciones *para venta* de países extranjeros." (Bastardillas nuestras). *Cf.* 58 Harv.L.Rev. 858, 874-76, que censura la doctrina del paquete original.

El caso de *Hooven* es el último poste indicador en cuanto a si la cláusula de importación se aplica a Puerto Rico. Dicho caso no trataba directamente, como aquí estamos tratando, del poder de Puerto Rico para tasar una importación a Puerto Rico de un país extranjero mientras la mercancía esté todavía en el paquete original. Más bien en él estaba envuelta la cuestión de si bajo la cláusula de importación la mercancía traída de las Filipinas a un estado de la Unión estaba sujeta a contribuciones por el estado mientras la mercancía estaba todavía en el paquete original. Y se resolvió que tal mercancía está protegida por la cláusula de importación y la doctrina del paquete original contra contribuciones estatales, no obstante el hecho de que la mercancía llegó al estado procedente de un territorio bajo la soberanía de los Estados Unidos más bien que de un país extranjero. Al llegar a esta conclusión, la Corte resuelve dos cuestiones: (1) se clasifica la mercancía como una importación bajo la cláusula de importación aun cuando no proceda de un país extranjero, siempre y cuando que proceda de un lugar fuera de los Estados Unidos, págs. 668–71; y (2) mercancía proveniente de las Filipinas a los Estados Unidos continentales es mercancía que procede de un lugar fuera de los Estados Unidos a tenor de la cláusula de importación, págs. 671–79.

Para nosotros el lenguaje significativo de la Corte es que (pág. 674) "los artículos traídos de las Filipinas a los Estados Unidos son importaciones en el sentido de que son traídos de un territorio, que no forma parte de los Estados Unidos, al territorio de Estados Unidos, organizado por y bajo la Constitución, *sitio donde únicamente se aplica la cláusula de importación de la Constitución.*" (Bastardillas nuestras). La Corte añade a la pág. 678 que "las disposiciones constitucionales que gobiernan las importaciones y las exportaciones y las contribuciones impuestas a las mismas, no se extienden a los artículos llevados *dentro* o traídos fuera de las Filipinas." (Bastardillas nuestras).

La cuestión de si el poder de las Filipinas para imponer contribuciones locales sobre mercancía importada en dichas islas está restringido por la cláusula de importación, no estaba envuelta directamente en el caso de *Hooven*. Pero dicho caso sí resuelve que la cláusula de importación impide la contribución estatal sobre mercancía que viene a un estado procedente de las Filipinas por el fundamento de que la mercancía traída *de* las Filipinas a un estado es una importación en el sentido constitucional. Por tanto forzoso es concluir que la mercancía traída de un país extranjero *a* las Filipinas no constituye tal importación. Es decir, esta disposición constitucional tiene dos filos: si la cláusula de importación es aplicable solamente en los Estados Unidos continentales, al efecto de que la mercancía traída de las Filipinas a un estado constituye una importación, de igual manera su aspecto restrictivo se aplica únicamente a los Estados Unidos continentales, de manera que la cláusula de importación no impide la imposición local de contribuciones sobre las importaciones a las Filipinas. Resolver lo contrario sería declarar que la mercancía que se lleva a las Filipinas y la que se trae de las Filipinas constituye en ambos casos una importación. La opinión en el caso de *Hooven* reconoce la validez de este razonamiento al manifestar que la cláusula de importación se aplica solamente en los Estados Unidos continentales y no se extiende a artículos que lleguen o salgan de las Filipinas.

Al arribar a su conclusión en el caso de *Hooven* la Corte descansa a las págs. 672–74 en casos que envuelven otros territorios que no son las Filipinas. Algunos de estos casos se originaron en Puerto Rico. *De Lima* v. *Bidwell,* 182 U.S. 1; *Downes* v. *Bidwell,* 182 U.S. 244; *Dooley* v. *United States,* 182 U.S. 222; *Dooley* v. *United States,* 183 U.S. 151; *Balzac* v. *Porto Rico,* 285 U.S. 298, 304–5. Por tanto podría argüirse que Puerto Rico, que se ha resuelto es un territorio de los

Estados Unidos organizado pero no incorporado, descansa en el mismo plano constitucional que las Filipinas en relación con la cláusula de importación. *Cf. Morales et al.* v. *Junta de Inscripciones,* 33 D.P.R. 79. En verdad el Juez Reed asume esta posición a las págs. 680, 686 de su opinión disidente en el caso de *Hooven.*([14])

Sin embargo, no puede negarse que la opinión de la mayoría descansa también en un número de leyes federales que se aplican exclusivamente a las Filipinas, págs. 675–79. Y la opinión nunca dice explícitamente que el caso es de aplicación a cualquier territorio que no sea las Filipinas. Quizás podría argüirse por tanto que el caso de *Hooven* no es aplicable a Puerto Rico y que la cláusula de importación se aplica a Puerto Rico. La teoría de este argumento es que históricamente las Filipinas y Puerto Rico han sido tratados siempre diferentemente por el Congreso en cuanto a la cuestión de tarifas. Desde el principio las Filipinas en gran parte han permanecido fuera de la barrera tarifaria de los Estados Unidos. Por otro lado, desde 1900, Puerto Rico ha estado dentro de la barrera tarifaria de los Estados Unidos. Véase Parte IV. El Congreso, siguiendo este argumento, ha hecho casi todo lo que le ha sido posible para incorporar a Puerto Rico desde el punto de vista de aduana, con las comparativamente pequeñas excepciones de los privilegios concedidos a Puerto Rico bajo la ley del café y la Ley Butler. Véase Parte V.

Con anterioridad al caso de *Hooven,* con la excepción de una inconclusa referencia al problema contenida en el caso de *West India Oil Co.* v. *Gallardo,* 6 F.2d 523, 525 (C.C.A. 1, 1925), nuestra Corte de Circuito, hasta donde hemos podido averiguar, consideró la aplicabilidad de la cláusula de importación a nuestras leyes contributivas en sólo dos casos. El primero envolvía el poder de la legislatura de Puerto

---

([14])Hace algunos días las Filipinas se convirtieron en una República; pero esto no afecta el valor del caso de *Hooven* como precedente.

Rico a imponer contribución sobre la propiedad a mercancía importada a Puerto Rico procedente de un país extranjero mientras la mercancía estaba todavía en el paquete original. Si bien devolvió el caso a la corte de distrito con instrucciones de que lo 'desestimara debido a que no estaba envuelta la cuantía jurisdiccional de $3,000, la Corte dijo en un *dictum* que la cláusula de importación "es claramente una limitación de los poderes de los estados y no es aplicable a Puerto Rico." *Gallardo* v. *Santini Fertilizer Co.*, 11 F.2d 587, 588 (C.C.A. 1, 1926), revocado el fallo por otros motivos, 16 F.2d 368, 275 U.S. 62. Un año después, sin mencionar el caso de *Santini*, la Corte de Circuito resolvió que una contribución puertorriqueña sobre una importación en el paquete original era inválida en virtud de la cláusula de importación. *Puerto Rico Tax Appeals*, 16 F.2d 545, 549 revocado por otros motivos, 275 U.S. 56, que dió lugar a la aprobación de la Ley Butler, discutida en detalle más adelante. Véase también, *Miranda* v. *People of Puerto Rico*, 101 F.2d 26, 29 (C.C.A. 1, 1938), con el cual compárese *Porto Rico Brokerage* v. *United States*, 76 F.2d 605, 610 (Cust. & Pat. App., 1935).

La cuestión de si el caso de *Puerto Rico Tax Appeals* constituye todavía la ley, o si el caso de *Hooven* se aplica tanto a Puerto Rico como a las Filipinas, es un punto que no tenemos que resolver en este caso en virtud de nuestra conclusión en la Parte IV.([15])

---

([15]) Se ha resuelto que otras disposiciones de la Constitución no son aplicables a los territorios. *Haavik* v. *Alaska Packers Ass'n*, 263 U.S. 510, 515, con el cual compárese *Fiddler* v. *Tribunal de Contribuciones*, 65 D.P.R. 202, (cláusula de privilegios e inmunidades); *People of Puerto Rico* v. *Eastern Sugar Associates*, supra, (Enmienda Décimocuarta); *Lastra* v. *New York & Porto Rico S.S. Co.*, 2 F.2d 812 (C.C.A. 1, 1924), (Jurisdicción de Almirantazgo); *Alaska* v. *Troy*, 258 U.S. 101, (Artículo 1, Sección 9, Cl. 6); *Moore* v. *Corte de Distrito*, 59 D.P.R. 610, 621, (Artículo 1, Sección 8, Cl. 17). Véase Ponsa Feliú Territorio Bajo Jurisdicción Federal, 7 Revista de Derecho, Legislación y Jurisprudencia del Colegio de Abogados de Puerto Rico, 165, 171–2.

Para una hábil discusión de la aplicabilidad a Puerto Rico de varias cláusulas de la Constitución, véase Picó, supra, págs. 322–34.

## IV

La cuestión de si el Acta Orgánica impide la imposición de contribuciones insulares sobre las importaciones([16]) fué dejada sin resolver en el caso de *Gallardo* v. *Santini Fertilizer,* supra, pág. 588, y, hasta donde sepamos, nunca ha sido determinada.

La sección 2 del Acta Foraker fué- dejada en vigor por la Sección 58 del Acta Jones, 39 Stat. 951, 968; *Benítez Sugar Co.* v. *Aboy, Tesorero,* 34 D.P.R. 36. En la Sección 2, de conformidad con su poder plenario para legislar sobre Puerto Rico bajo la cláusula de territorios, el Congreso puso a Puerto Rico dentro de la barrera tarifaria de los Estados Unidos—los mismos derechos de aduana, ni más altos ni más bajos, son cobrados sobre mercancía importada de países extranjeros ya sea a los Estados Unidos o a Puerto Rico. 48 U.S.C. Sec. 739.

También la Sección 58 del Acta Jones dejó en vigor la Sección 3 del Acta Foraker. En vez de hacer uso de su poder para imponer un derecho de aduana sobre la mercancía llevada a los Estados Unidos procedente de Puerto Rico o viceversa—*Downes* v. *Bidwell,* 182 U.S. 244; *United States* v. *Heinszen & Co.,* 206 U.S. 370; *Hooven & Allison Co.* v. *Evatt,* supra, pág. 674; *Miranda* v. *People of Puerto Rico,* supra; véase *Morales et al.* v. *Junta de Inscripciones,* 33 D.P.R. 79— el Congreso en esta sección estableció el comercio libre entre Puerto Rico y los Estados Unidos. 48 U.S.C. Sec. 738.

La Sección 3 del Acta Jones autorizó a nuestra legislatura—que sólo tiene aquellos poderes contributivos que el Congreso le ha otorgado, *Domenech* v. *National City Bank,* 294 U.S. 199—a imponer ''contribuciones e impuestos sobre la propiedad, ingresos, rentas internas, y por licencias. . .''.

---

([16])Para mayor claridad, en esta opinión describimos como una importación en Puerto Rico únicamente la mercancía traída a Puerto Rico procedente de un país extranjero; la mercancía traída aquí procedente de los Estados Unidos se describe como introducida en Puerto Rico.

48 U.S.C. Sec. 741. Estamos convencidos de que al omitir esta Sección una disposición específica dándole poderes a la legislatura insular para imponer un derecho de aduana sobre las importaciones a Puerto Rico, fué una elección deliberada del Congreso de no otorgarle este poder a Puerto Rico, con el fin de evitar la infracción por parte de la legislatura insular de la Sección 2 del Acta Foraker al efecto de que la mercancía procedente de un país extranjero pagará el mismo derecho de aduana ya sea ésta importada a Estados Unidos o a Puerto Rico. Véase la Parte V y los casos allí citados; *Jordan* v. *Roche*, 228 U.S. 436, 441.

Cuando el Congreso tuvo el deseo de variar esta regla para permitirle a Puerto Rico imponerle un derecho de aduana al café, aprobó legislación expresa a ese efecto. 19 U.S.C. Secs. 1319, 1319(a); *Miranda* v. *People of Puerto Rico,* supra; *Porto Rico Brokerage Co.* v. *United States,* 80 F.2d 521 (Cust. & Pat. App., 1936), revocando 76 F.2d 605, confirmando 71 F.2d 469. Del mismo modo, el Congreso en la Ley Butler, citada en el escolio 18, autorizó a Puerto Rico a imponer sus contribuciones de rentas internas sobre las importaciones sin referencia a las leyes y reglamentos de aduana. *West India Oil Co.* v. *Domenech,* 311 U.S. 20. Pero si Puerto Rico ya tenía el poder para imponer derechos de aduana a las importaciones, la ley del café y la Ley Butler estaban demás. Y si Puerto Rico ya tenía mano libre del Congreso para imponer derechos de aduana sobre las importaciones generalmente sin referirse a estas leyes, las cortes pudieron resolver los casos del café y el de la *West India Oil Co.* v. *Domenech* con la escueta manifestación de que el Congreso ya había expedido carta blanca a la legislatura insular, sin entrar en las extensas discusiones sobre el alcance de la ley del café y de la Ley Butler. Véase la Parte V, especialmente la nota 21. Parece claro que tanto el Congreso como las cortes creyeron que la ley del café y la Ley Butler constituían legislación necesaria y que sin ellas la legisla-

tura insular carecía de los poderes concedídosle en dichos estatutos para imponer contribuciones sobre las importaciones.

Podría argüirse que un derecho de aduana aprobado por la legislatura insular no estaría en conflicto con la Sección 2 del Acta Foraker, toda vez que el derecho de aduana insular sería en adición a y no menoscabaría el cobro del derecho federal. Tiene dudosa validez este argumento. Los cobros de un derecho federal de aduana, establecido primordialmente para proveer rentas, podrían en la práctica ser menoscabados, si la adición de un derecho insular hace que los dos derechos sean tan elevados que se desalentara el comercio extranjero. Además, es muy difícil que la intención del Congreso fuera poner el mismo evento bajo doble contribución.

De cualquier modo, aquí hay una contestación concluyente. El Congreso puede aprobar leyes tarifarias para reglamentar el comercio extranjero, para obtener rentas, o para ambas cosas. *McGoldrick* v. *Gulf Oil Corp.*, 309 U.S. 414, 427; *Board of Trustees* v. *United States*, 289 U.S. 48. De ordinario la renta ingresa a la Tesorería Federal. Pero el Congreso no estaba interesado en la renta federal cuando aprobó la Sección 2 del Acta Foraker: dispuso que el dinero cobrado en Puerto Rico bajo las leyes tarifarias federales ingresaría en el tesoro insular. 31 Stat. 78; 48 U.S.C. Sec. 740. Es manifiesto que el Congreso estaba primordialmente interesado en las condiciones del comercio extranjero. Puerto Rico recibe las rentas provenientes de los derechos; pero las tarifas las fija el Congrso. Si la legislatura de la isla impusiera un derecho adicional insular sobre las importaciones, esto frustaría por tanto el propósito del Congreso de que, para beneficio del comercio extranjero, los derechos de aduana sean los mismos para la mercancía importada ya sea a los Estados Unidos o a Puerto Rico. *Cf. Board of Trustees* v. *United States*, 289 U.S. 48, 59.

Además, resolver lo contrario equivaldría a crear una fuente de incalculables conflictos entre los dos gobiernos. Puerto Rico es un distrito federal para el cobro de derechos de aduana, con todo lo necesario para la entrada, custodia, almacenes de adeudo, inspección y entrega que acompañan a tal designación. Véase la Parte VI. Si Puerto Rico pudiera imponer derechos a las importaciones, concebiblemente podría establecer un distrito de cobro similar al lado del de los Estados Unidos. Entonces surgiría la cuestión de cuál gobierno tendría jurisdicción a los fines de aduana sobre mercancía que llega a un puerto puertorriqueño. En verdad, cuando el Congreso autorizó a Puerto Rico a imponerle un derecho al café, obvió esta dificultad al disponer que el cobro se haría a través de los funcionarios de aduana federales. 19 U.S.C. Sec. 1319. ([17])

Refiriéndonos a nuestros casos, hemos resuelto que "no es posible a la Legislatura de Puerto Rico imponer una contribución que de hecho opere . . . como un derecho de importación sobre artículos introducidos en Puerto Rico de los Estados Unidos." *Panzardi et al.* v. *Gallardo*, 35 D.P.R. 947, 950; *Benítez Sugar Co.* v. *Aboy, Tesorero*, 34 D.P.R. 36. Por los motivos aquí expuestos, concluimos que la misma regla se aplica a las importaciones a Puerto Rico de un país extranjero en virtud de las Secciones 2 y 3 del Acta Foraker y la Sección 3 del Acta Jones. Y nuestro *dictum* en *West India Oil Co. (P.R.)* v. *Tesorero*, 54 D.P.R. 732, 747–48, está correcto en el sentido de que bajo el Acta Orgánica, según leía ésta antes de 1927, la legislatura insular no podía

---

([17]) El caso de *Puerto Rico* v. *Shell Co.*, 302 U.S. 253, no cambia este resultado. En él la Corte Suprema resolvió que el hecho de que el Sherman Anti-Trust Act se aplicara dentro de Puerto Rico no impedía a la legislatura insular aprobar legislación sustancialmente similar, siempre y cuando que esta última no estuviera en conflicto con la Ley Federal. *Luce & Co.* v. *Junta de Salario Mínimo*, 62 D.P.R. 452; *Sucesores de José Fernández, S. en C.* v. *Domenech, Tes.*, 60 D.P.R. 906, 912. Pero la imposición de un derecho de aduana insular estaría en conflicto con el propósito del Congreso de que los derechos de aduana sean los mismos en Puerto Rico que en Estados Unidos.

hacer de la importación a Puerto Rico de mercancía extranjera un evento tributable.

## V

■■ El próximo problema es determinar si el Congreso consintió a esta contribución en la Ley Butler.([18]) Hasta donde es aplicable a la mercancía traída a Puerto Rico de los Estados Unidos, la Ley Butler eliminó la duda en cuanto a si podían imponerse arbitrios insulares mientras la mercancía estaba todavía en el paquete original. Quizá las cortes hubieran llegado al mismo resultado en la mayoría de los casos sin la Ley Butler. Véase la Parte II, donde decimos que (1) la cláusula de comercio no es aplicable a Puerto Rico; (2) aún si lo fuera, la doctrina del paquete original ya no se aplica a casos de comercio interestatal; y (3) la Corte Suprema ha ido liberalizando las restricciones que pesan sobre los estados para tributar artículos que se han transportado de un estado a otro. De cualquier modo, aun para tal mercancía, la Ley Butler sirve el propósito adicional y eminentemente práctico de proveer la ayuda de los funcionarios postales en el cobro de las contribuciones.

En relación con las importaciones a Puerto Rico de países extranjeros, la Ley Butler tuvo un resultado aún más sustancial. Hemos resuelto que, independientemente de la cláusula de importación, el Congreso en virtud del Acta Orgánica prohibió la contribución insular sobre importaciones propiamente dichas. Véase la Parte IV. Sin la ayuda de la

---

([18])Esta Ley, aprobada en 1927, le añadió a la Sección 3 del Acta Jones lo siguiente: ''Las *contribuciones de rentas internas* que de acuerdo con la facultad concedida por esta ley imponga la Asamblea Legislativa de Puerto Rico, sobre cualesquiera artículos, efectos, mercaderías, o mercancías, podrá ser impuesta y cobrada sobre los artículos sujetos a dicha contribución, según determine la referida Asamblea Legislativa, tan pronto como los mismos hayan sido fabricados, vendidos, usados o importados en la Isla; *Disponiéndose,* que no se hará discrimen alguno entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico. Por la presente se ordena a los oficiales de aduanas y del servicio postal de Estados Unidos que ayuden a los debidos funcionarios del Gobierno de Puerto Rico en el cobro de estas contribuciones.'' (48 U.S.C. Sec. 741(*a*); las primeras bastardillas son nuestras).

Ley Butler, hubiera surgido por tanto la cuestión de si Puerto Rico podía imponer una contribución sobre mercancía importada a Puerto Rico mientras estuviera en su paquete original; v.g., si la disposición de la Sección 2 del Acta Foraker al efecto de que Puerto Rico estaría dentro de la barrera tarifaria de los Estados Unidos, nos obliga a resolver que la doctrina del paquete original—abandonada por la Corte Suprema en los casos de la cláusula de comercio pero aún en vigor para las importaciones a Estados Unidos continentales como corolario de la cláusula de importación—también es un corolario de la Sección 2 del Acta Foraker.

Cualquiera que pudiera haber sido la contestación de las cortes a esta pregunta, el "efecto del amplio lenguaje de la [Ley Butler] . . . no fué sólo hacer que estuvieran sujetos a las contribuciones todos los artículos importados. . . de. . . países extranjeros, cuando fuesen traídos a la Isla en su paquete original, sino neutralizar el efecto regulador de las leyes y reglamentos de aduana en tanto en cuanto éstos protegían los artículos contra contribución local después de su llegada. La mercancía en su paquete original estaba sujeta de esta manera a contribución cuando se trajo a la Isla, prescindiendo de los reglamentos de aduana." *West India Oil Co.* v. *Domenech,* supra, pág. 28. Además, como en el caso de las autoridades postales, los funcionarios de aduana estaban obligados a prestar ayuda en el cobro de las contribuciones.

Pero aún no hemos llegado al final de la jornada. Todavía nos queda la cuestión de si el Congreso en la Ley Butler "neutralizó" los reglamentos de aduana y la Sección 2 del Acta Foraker a los fines de imponer contribuciones tanto sobre la propiedad como de rentas internas.

La Sección 3 del Acta Jones le confiere poder a la legislatura insular para imponer contribuciones sobre la propiedad, ingresos y rentas internas. La Ley Butler le adicionó a esta Sección un disponiéndose al efecto de que las "contribuciones de rentas internas que de acuerdo con la facultad

concedida por esta ley imponga la Asamblea Legislativa de Puerto Rico sobre. . . mercancías. . . podrá ser impuesta. . . tan pronto como los mismos hayan sido fabricados, vendidos, usados o importados en la Isla. . .''. Diferente a la ley del café, ésta no era una disposición de que Puerto Rico podía imponer un derecho de aduana sobre las importaciones pro- piamente dichas. Tampoco "neutralizó" las leyes y regla- mentos de aduana a los fines de cada clase de contribución que el Congreso había autorizado a la legislatura insular a imponer.[19] · Al contrario, de su faz provee que "neutra- liza" las leyes y reglamentos de aduana en relación con la imposición de contribuciones de rentas internas solamente. Y la historia legislativa de la Ley Butler indica la intención del Congreso de que fuera aplicable solamente a las contri- buciones insulares sobre rentas internas: fué aprobada con el fin de aclarar las dudas surgidas en el caso de *Porto Rico Tax Appeals* (1) en cuanto al alcance del poder de Puerto Rico bajo la Sección 3 del Acta Jones para imponer contri- buciones de rentas internas a la mercancía traída a Puerto Rico bien de los Estados Unidos o de países extranjeros, y (2) en cuanto a cuándo entra en juego dicho poder.[20]

---

[19] Nos damos cuenta de que en el caso de la *West India Oil Co.* la Corte Suprema describe la Ley Butler como que libera (pág. 27) "cualquier contri- bución autorizada por la Carta Orgánica . . . " de los rigores de la doctrina del paquete original. Pero allí no se controvertía que la contribución envuelta era una de rentas internas. Por tanto, la atención de la Corte no se fijó en nuestro problema de si la Ley Butler cubre contribuciones sobre la propiedad así como sobre rentas internas, no pasando la corte sobre dicha cuestión. A primera vista quizá parecería que actuamos inconsistentemente al no prestar atención a esta manifestación casual y aislada del caso de la *West India Oil Co.* después de haberle dado considerable peso al lenguaje empleado por la Corte en el caso de *Hooven.* Véase la Parte III. Pero en este último caso el lenguaje que creemos es el que gobierna está más detallado, nos parece que ha sido elegido deliberadamente y trataba de un problema que la Corte no podría dejar de tener en cuenta: si la cláusula de importación se aplicaba tanto a mercancía que entraba como a la mercancía que salía de las Filipinas.

[20] Los motivos por los cuales se aprobó la Ley Butler están expuestos en S. Rept. Núm. 1011, 69th Cong., 1st Sess., pág. 2, y H. Rep. Núm. 1370, 69th Cong., 1st Sess., pág. 2, como sigue: "Al hacer uso de la autoridad conferídale por la Sección 3 para imponer y cobrar contribuciones de *rentas internas,* el Gobierno de Puerto Rico ha encontrado que es imposible cobrar *dichas* contribu-

Cierto es que si el Congreso hubiera extendido la Ley Butler a contribuciones sobre la propiedad así como sobre rentas internas, se hubiera esfumado la duda en cuanto a si podría imponerse la contribución sobre la propiedad sobre mercancía importada, descargada en Puerto Rico pero todavía en su paquete original; y se habría eliminado el discrimen que posiblemente pueda existir contra la mercancía continental, que está sujeta a contribución sobre la propiedad bajo circunstancias similares. Véase la Parte VI, especialmente la nota 25. Pero el Congreso no consideró este problema. La Ley Butler fué redactada primordialmente para relevar nuestras contribuciones de rentas internas, que ocupan un lugar más prominente aquí que las contribuciones sobre la propiedad, de la doctrina del paquete original, y para conseguir la ayuda de los funcionarios federales en su cobro. Toda vez que la mercancía está sujeta a contribuciones de rentas internas independientemente de la fecha de entrada en Puerto Rico, la Ley Butler es de vital ayuda en la imposición y cobro de contribuciones de rentas internas durante todo el año. Pero a los efectos de la contribución sobre la propiedad de conformidad con el artículo 297 del Código Político, la fórmula es quién es el dueño de la propiedad para el día contributivo. *Varcárcel* v. *Sancho, Tesorero,* supra.

---

ciones sobre artículos comprados en los Estados Unidos y enviados por correo a Puerto Rico, o algunas veces cuando dichos artículos eran enviados por barco, toda vez que las cortes han resuelto que las autoridades postales o de aduana no tienen autoridad para retener la entrega de tales artículos sujetos a la contribución de rentas internas hasta que ésta se pague, ya que tal contribución cobrada en esta forma es en efecto un derecho de aduana. En otras palabras, las cortes han resuelto que la *contribución de rentas internas* no puede cobrarse mientras el artículo sujeto a la misma se encuentra en el paquete original.

"Este estado de cosas prácticamente ha anulado el poder del gobierno insular para imponer contribuciones de *rentas internas*, y en su consecuencia la eficacia de esta fuente de ingresos ha sido seriamente menoscabada.

"* * * # * * *

"Se espera que el Gobierno de Puerto Rico hará uso de este poder de manera tal que no interponga innecesariamente barrera alguna en el curso de las condiciones de comercio libre que existen hoy día entre [Puerto Rico] y el continente, que constituye el principal factor en el progreso y prosperidad de Puerto Rico." (Bastardillas nuestras).

Sólo en el caso poco corriente, como el presente, en que la mercancía importada todavía no ha abandonado la custodia aduanera([20a]) o ha sido descargada en Puerto Rico, pero que todavía está en su paquete original para el día contributivo, entraría en juego la Ley Butler, aun si el Congreso la hubiera hecho aplicable a contribuciones sobre la propiedad. En muchos, si no en casi todos los casos, pueden imponerse válidamente nuestras contribuciones sobre la propiedad sin la ayuda de la Ley Butler debido a que la propiedad está en las manos del dueño o de su agente y ha abandonado su paquete original el día contributivo. *Cf.* nota 9. Por tanto, el Congreso ha podido pensar que como proposición general no había necesidad imperiosa de que se extendiera la Ley Butler a las contribuciones sobre la propiedad. De cualquier modo, cualesquiera que hayan podido ser sus motivos, el hecho cierto es que el Congreso dejó de incluir en la Ley Butler las contribuciones sobre la propiedad.

■ Además, no puede argumentarse que una contribución sobre la propiedad cae dentro de la clasificación de las contribuciones de rentas internas contempladas por la Ley Butler. Una contribución sobre venta "por su naturaleza es un *excise tax*, un arbitrio y no una contribución sobre la propiedad." *West India Oil Co. (P.R.)* v. *Tesorero,* 54 D.P.R. 732, 750; *West India Oil Co. (P.R.)* v. *Benítez, Administrador,* 51 D.P.R. 273, 278; *Benítez Sugar Co.* v. *Aboy, Tesorero,* supra; *Panzardi et al.* v. *Gallardo,* supra; *Flores Álvarez & Co.* v. *Gallardo,* 36 D.P.R. 117; *Gromer* v. *Standard Dredging Co.,* supra; *Lugo* v. *Suazo,* supra; Anotación, 103 A.L.R. 18; véanse *Brown-Forman Co.* v. *Kentucky,* 217 U.S. 563; *Billings* v. *United States,* 232 U.S. 261. Aun si, como proposición general, esto no fuera cierto, la Sección 3 del Acta Jones coloca las contribuciones sobre la propiedad en una categoría diferente a las contribuciones de rentas internas;

---

([20a]) Suponemos, sin decidirlo, que la mercancía continental bajo la custodia de funcionarios postales para el día contributivo está en una situación diferente y está sujeta a nuestra contribución sobre la propiedad. Véase nota 25.

la cuidadosa distinción señalada por el Congreso en dicha Sección entre los diferentes tipos de contribuciones—de rentas internas, sobre la propiedad y sobre ingresos—es obligatoria para nosotros. *Jordan* v. *Roche,* 228 U.S. 436, 441; *Loíza Sugar Co.* v. *People of Porto Rico,* 57 F.2d 705 (C.C.A. 1, 1932); *West India Oil Co.* v. *Domenech,* supra; *Rivera* v. *Buscaglia,* 146 F.2d 461 (C.C.A. 1, 1944); *Sucrs. de C. & J. Fantauzzi* v. *Asamblea Municipal de Arroyo,* 30 D.P.R. 423.

De ser necesario algo más, la Ley Butler fué una enmienda a la Sección 3 del Acta Jones, que disponía que la legislatura tenía poder para imponer específicos tipos de contribuciones—sobre ingresos, sobre la propiedad y de rentas internas. Cuando el Congreso le añadió un disponiéndose a la Sección 3 ampliando el poder concedido para imponer contribuciones de *rentas internas,* tiene que haber sido su intención que la ampliación de ese poder se aplicase exclusivamente a las contribuciones sobre rentas internas. No podemos hacer caso omiso de la intención y del lenguaje expreso del Congreso.

Tenemos por fuerza que concluir que las contribuciones sobre la propiedad no son contribuciones de rentas internas de acuerdo con la Sección 3 del Acta Jones y que la contribución sobre la propiedad aquí envuelta debe pasar por el crisol del Acta Orgánica sin la ayuda de la Ley Butler.[21]

[21] En el pasado hemos dejado sin resolver la cuestión de si la Ley Butler autoriza la imposición de una contribución de rentas internas a la introducción de artículos en Puerto Rico procedentes de los Estados Unidos como un evento tributable. *Puerto Rico Ilustrado* v. *Buscaglia,* 64 D.P.R. 914; *Pyramid Products* v. *Buscaglia,* 64 D.P.R. 828, 839, nota 4a; *Buscaglia* v. *Ligget & Myers Tobacco Co.,* 149 F.2d 493, 494, nota 1 (C.C.A. 1, 1945). Este caso no requiere se conteste esa cuestión.

Tampoco estamos llamados a determinar la cuestión de si la introducción en Puerto Rico de un país extranjero, v.g., importación, puede bajo la Ley Butler hacerse un evento contributivo de acuerdo con nuestras leyes de rentas internas. Tal contribución tendría que hacerle frente a los siguientes argumentos:

(1) Bajo el pretexto de un nombre diferente—"contribución de rentas internas"—la legislatura en substancia estaría imponiendo un derecho de aduana a las importaciones, que aquí resolvemos no tiene autoridad para imponer.

## VI

 Toda vez que la Legislatura insular carece de poder para imponerle un derecho a las importaciones, podría argüirse que para el día contributivo Puerto Rico no podía válidamente imponer una contribución sobre la propiedad sobre esta mercancía, debido a que en dicho día era una importación que se encontraba aún en el paquete original y no se había vendido o usado.

El razonamiento sobre este punto es el siguiente. La Constitución le prohibe a un Estado imponer un derecho a las importaciones. Esto impide a un estado imponer una contribución sobre la propiedad a mercancía importada aún después de haberse ésta descargado y se encuentre estacionada en el estado, siempre y cuando que esta mercancía permanezca aún en su paquete original y no se haya vendido o usado. En el Acta Orgánica el Congreso le prohibe a Puerto

(2) La Ley Butler contiene un disponiéndose prohibiendo el "discrimen entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico". ¿Infringiría este disponiéndose una contribución sobre la introducción que va a pagarse solamente por los artículos que vengan fuera de Puerto Rico, toda vez que los artículos fabricados aquí no son introducidos en Puerto Rico? Véanse *Sancho* v. *Corona Brewing Corporation*, 89 F.2d 479, 481 (C.C.A. 1, 1937), y *San Juan Trading Co.* v. *Sancho*, 114 F.2d 969 (C.C.A. 1, 1940), con el cual compárase *Rossi* v. *Sancho, Tes.*, 53 D.P.R. 491, 493–94; véanse *Ghinaglia* v. *Domenech, Tesorero*, 44 D.P.R. 915; *P. R. Distilling Co.* v. *Sancho Bonet, Tesorero*, 52 D.P.R. 672.

(3) Si la Ley Butler, aprobada en 1927, ya había permitido una contribución local sobre la introducción a Puerto Rico de un país extranjero, es decir, sobre importación, ¿por qué fué necesario que el Congreso pasara un estatuto en 1930 autorizando a Puerto Rico para que impusiera un derecho de aduana sobre el café?

(4) La Ley Butler aparentemente le da a Puerto Rico sustancialmente el mismo poder para imponer contribuciones a mercancía ora importada a Puerto Rico o traída de los Estados Unidos. Resolver que Puerto Rico podría hacer de la importación un evento contributivo, parece por tanto requerir una resolución similar de que Puerto Rico podría hacer de la introducción procedente de los Estados Unidos un evento contributivo. Véase el primer párrafo de esta nota. Pero desde 1900 ha existido comercio libre entre Puerto Rico y los Estados Unidos. Sección 3 de la Ley Foraker. ¿Fué la intención del Congreso derogar dicha Sección tan livianamente y permitirle a Puerto Rico imponer una contri-

Rico imponer un derecho a las importaciones. El Congreso tenía conocimiento de la doctrina del paquete original cuando colocó a Puerto Rico dentro de la barrera tarifaria. Por tanto fué la intención del Congreso que la doctrina del paquete original se aplicara aquí del mismo modo que se aplica a una importación en un estado. En verdad, cuando el Congreso deseó "neutralizar" la doctrina del paquete original, en tanto en cuanto ésta impedía el cobro de las contribuciones insulares de rentas internas, llevó a efecto este propósito aprobando la Ley Butler. Pero al omitir las contribuciones sobre la propiedad en dicha ley, el Congreso deliberadamente eligió impedir que se impusieran contribuciones insulares sobre la propiedad a una importación a Puerto Rico mientras ésta se encontraba en el paquete original.

Para el día contributivo esta mercancía se encontraba aún en el paquete original y no se había vendido o usado. Como cuestión de hecho, todavía no se había descargado en dicho día. Si se adoptara el razonamiento del último párrafo equi-

bución sobre la introducción de mercancía en Puerto Rico procedente de los Estados Unidos cuando aprobó la Ley Butler, que era una enmienda de la Sección 3 del Acta Jones, y no de la Sección 3 de la Ley Foraker? Aquí también, el contestar afirmativamente esta cuestión haría necesario decir que el estatuto del café de 1930—en el que el Congreso autorizó un derecho de aduana por Puerto Rico sobre el café tanto importado a Puerto Rico de un país extranjero como el introducido a Puerto Rico de los Estados Unidos—era superfluo toda vez que el Congreso ya le había concedido a Puerto Rico el poder de imponer contribución a la introducción de mercancía en Puerto Rico procedente de los Estados Unidos mediante la Ley Butler en 1927.

(5) La Ley Butler no dice que Puerto Rico puede imponer una contribución *sobre* la fabricación, venta o introducción en Puerto Rico; dispone que puede imponerse una contribución sobre los artículos *tan pronto como* son fabricados, vendidos, usados o introducidos en la Isla.

(6) Al afirmar en *West India Oil Co.* v. *Domenech*, supra, que la contribución de rentas internas era (pág. 28) "en su efecto práctico un derecho de aduana . . ." la corte se refería a las condiciones comerciales por las cuales la mayoría de los artículos aquí usados son importados o traídos de los Estados Unidos. Es decir, toda vez que artículos similares no se producen aquí en la mayoría de los casos, una contribución inmediatamente después de su arribo es en su efecto económico de la naturaleza de un derecho de aduana. Pero esto es bastante diferente a la proposición de que la introducción o la importación es, legalmente hablando, un evento contributivo. *West India Oil Co.* v. *Gallardo*, 6 F.2d 523, 525-6 (C.C.A. 1, 1925).

valdría por tanto a resolver este caso a favor de la contribuyente sin ulterior discusión. Sin embargo, existiendo un fundamento más limitado que nos lleva al mismo resultado, preferimos basar nuestra decisión en él, dejando pendiente la cuestión de si la doctrina del paquete original propiamente dicha se aplica a las importaciones a Puerto Rico.

Cuando el Congreso prohibió la imposición de un tributo a las importaciones en Puerto Rico, puede o no haber sido su intención adoptar la doctrina del paquete original "en toda su fuerza y vigor".[22] Pero no puede haber gran duda de que el Congreso no tuvo la intención de permitir la imposición de una contribución local a mercancía mientras ésta estuviera en el proceso de importación. Si bien no directamente aplicable, debido a nuestro *status* constitucional, los casos ya indicados, que resuelven (1) que la cláusula de comercio prohibe se tributen artículos en tránsito y (2) que la cláusula de importación invalida una tributación local sobre mercancía en el paquete original, nos proporcionan analogías que nos ayudan a llegar a esta conclusión.[22a]

Argüir, como lo hace el Tesorero en este caso, que Puerto Rico tiene el poder de imponer una contribución a la propiedad radicada en la bahía de San Juan, no constituye contestación alguna. Indudablemente esto es cierto. *Gromer* v. *Standard Dredging Co.*, supra; Secciones 1, 7 y 8 del Acta Orgánica, que se encuentran en 48 U.S.C. secs. 731, 747, 749. Pero esto no quiere decir que mercancía que se encuentra en la bahía de San Juan para el día contributivo y que todavía está en proceso de importación esté sujeta a la contribución local sobre la propiedad.

---

[22] Tomamos prestada esta frase de la opinión concurrente del Juez Jackson en *Thomas* v. *Collins*, 323 U.S. 516, 548.

[22a] De decidirse en alguna otra ocasión que la cláusula de importación es aplicable a Puerto Rico, cuestión que dejamos pendiente en la Parte III, los casos que resuelven que la cláusula de importación anula la imposición local de contribuciones sobre mercancía que esté aún en el paquete original, serían enteramente aplicables y no simplemente análogos.

Pasemos por tanto al problema de determinar si esta mercancía estaba en proceso de importación. Aquí debemos tener en cuenta que la palabra "importación" puede tener diferentes significados en diferentes sitios. A los fines de cuándo se devengan los derechos de aduana, la importación consiste de la llegada de la embarcación dentro de los límites de un puerto de entrada con la intención de entrar la mercancía. 19 U.S.C. sec. 1431 *et seq.; Mata* v. *United States,* 19 F.2d 484 (C.C.A. 1, 1927); *The Squanto,* 13 F.2d 548 (C.C.A. 2, 1926); *Harrison* v. *Vose,* 9 How. 372; *Arnold* v. *United States,* 9 Cranch 103; *United States* v. *Vowell,* 5 Cranch 368. Esto significa que, si bien la mercancía en este caso fué descargada unos días después, los derechos de aduana se devengaron el 15 de enero, toda vez que Puerto Rico es un distrito de cobro aduanero, y San Juan es un puerto de entrada. *Code of Federal Regulations,* Título 19, Capítulo I, Parte I, sec. 1.2, pág. 326.

Pero el hecho de que, a los fines del pago de los derechos de aduana, se considera que la mercancía ha sido importada al arribar a un puerto de entrada, no quiere necesariamente decir que la mercancía también pasa simultáneamente a estar sujeta a las contribuciones locales. Esto se torna evidente cuando examinamos las leyes y reglamentos tarifarios que requieren una serie de pasos a efectuarse entre la llegada a un puerto de entrada y la entrega de la mercancía para descargarse.

Una embarcación que arriba procedente de un puerto extranjero debe informar su llegada a las autoridades de aduana, y debe entregar copia de su manifiesto indicando toda la mercancía que trae a bordo. 19 U.S.C. secs. 1431, 1433, 1435. La entrada, que es una palabra técnica bajo las leyes tarifarias, debe hacerse por el consignatario. Secciones 1484, 1485(a). Luego, se radica una declaración de valor, seguida de la inspección y tasación de los funcionarios de aduana. Secciones 1485-88, 1499.

No se puede descargar mercancía de una embarcación procedente de un puerto extranjero sin antes haber efectuado todos los pasos arriba reseñados. Permanece la mercancía bajo la custodia y gobierno de las autoridades de aduana durante todo el tiempo necesario para cumplir con estos requisitos. Sólo después de haberse cumplido con ellos, puede el colector expedir el permiso de entrega de la mercancía al importador para que se descargue ésta en el puerto de entrada. 19 U.S.C. sec. 1448; Code of Federal Regulations, supra, Parte II, sec. 2.18, pág. 347, sec. 6.11, pág. 382. Y en algunas ocasiones—por ejemplo, cuando se daña la mercancía o cuando su importación está prohibida—puede ser que nunca se descargue en el puerto de entrada.

Es cierto que el único fin de algunos de estos requisitos es asegurar el cobro de los derechos de aduana. Véase 22 Ops. Atty. Gen. 152. Quizá aún la regla establecida en *Villar & Co. Inc.* v. *Hansson,* 40 D.P.R. 316, 321–22, al efecto de que los bienes todavía bajo custodia de la aduana no pueden ser embargados bajo las leyes de Puerto Rico tiende al mismo propósito. Y pudiera ser que una vez que se satisfaga el interés del Gobierno Federal en el cobro de los derechos de aduana, individuos particulares distintos al importador puedan hacer valer sus derechos ante las cortes insulares en relación con la mercancía, no obstante el hecho de que ésta todavía se encuentre bajo la custodia aduanera. 21 Ops. Atty. Gen. 233; *Conard* v. *Pacific Insurance Co.,* 31 U.S. 261; *Bank of America* v. *Whitney-Central Nat. Bank,* 291 F. 929, 938–9 (C.C.A. 5, 1923). Pero ninguna de estas consideraciones obliga la conclusión de que, a los fines de imponer una contribución local sobre la propiedad, el proceso de importación se ha completado.

Al contrario, no se había llegado a conclusión alguna para el día contributivo en cuanto a si se efectuaría la importación de esta mercancía. Pudo estar deteriorada y entonces era obligatorio excluirla, caso en el cual el importa-

dor no tenía que pagar los derechos de aduana sobre la misma. *Lawder* v. *Stone,* 187 U.S. 281; *Marriott* v. *Brune et al.,* 50 U.S. 619; *Fabbri* v. *Murphy,* 95 U.S. 191, 197; *A. Hofman, Inc.* v. *United States,* 71 F2d 316 (Ct. Cust. & Pat. App., 1934). O podrían ser artículos cuya importación está prohibida. O podrían venir destinados a almacenarse en un almacén de adeudo del cual podían ser retirados para exportarlos a un país extranjero; bajo estas circunstancias no hay que pagar derechos y no existe importación. *McGoldrick* v. *Gulf Oil Corp.,* 309 U.S. 414; *During* v. *Valente,* 46 N.Y.S.2d 385 (N.Y., 1944); *State* v. *Intoxicating Liquors,* 109 A. 257 (Me., 1920); *West India Oil Co.* v. *Domenech,* 311 U.S. 20, 28–29; 21 Ops. Atty. Gen. 574; 27 Ops. Atty. Gen. 467.([23]) Si bien ninguno de estos hechos ocurrió aquí, nadie podía predecir para el día contributivo si iba a ocurrir alguno de ellos o todos. Hasta que el colector expida una orden de entrega de la mercancía, todavía existe la posibilidad de que la mercancía no entre a Puerto Rico, lo que quiere decir que el proceso de importación no se ha completado todavía y la mercancía no está sujeta a la contribución de Puerto Rico sobre la propiedad. Véase *American Cigar Co.* v. *United States,* 146 F. 484 (C.C.A. 2, 1906).([24])

Creemos que el resultado a que hemos llegado puede obtenerse por implicación del caso de *West India Oil Co.* v. *Domenech,* supra. La Ley Butler dispone que las contribuciones insulares de rentas internas pueden imponerse a mercancía tan pronto como ésta es traída a la isla. El Juez

---

([23])No nos detenemos a examinar la contención de que aún si los artículos fueren descargados y puestos en almacenes de adeudo, estarían exentos de contribuciones locales mientras permanecieran almacenados. Compárase *McGoldrick* v. *Gulf Oil Corp.,* supra, y *Thompson* v. *Kentucky,* 209 U.S. 340, con *West India Oil Company (P.R.)* v. *Tesorero,* 54 D.P.R. 732, 747–48, confirmado en 108 F.2d 144, 146. Aquí la mercancía ni siquiera había llegado al punto en que podía almacenarse en adeudo a solicitud del importador.

([24])Si deliberadamente se retrasó la entrega de la mercancía por el colector hasta pasado el día contributivo con el único fin de evadir la contribución sobre la propiedad, entonces quizás tendríamos una cuestión diferente. No se alega que esto ocurriera aquí.

Reed argumenta en su opinión disidente que esto no debe interpertarse en el sentido de permitir la contribución local mientras la mercancía esté todavía en manos de las autoridades de aduana. Dice a la pág. 31: "'Traída' debe interpretarse en el sentido de que significa cuando los artículos pasan del gobierno de la aduana al gobierno privado. . .".

La opinión de la mayoría puede haber querido decir por su lenguaje a las págs. 27–28 que bajo la Ley Butler (1) las contribuciones insulares de rentas internas pueden imponerse sobre mercancía mientras ésta esté todavía bajo la custodia aduanera; o (2) sencillamente puede haber querido decir que las autoridades aduaneras ayudarán a las autoridades insulares en el cobro de tales contribuciones que pueden imponerse tan pronto como la mercancía se desliga de la aduana. Los hechos no exigían una elección entre estas dos teorías. Aun si (2) fuera la interpretación correcta de la Ley Butler, un evento tributable ocurrió allí, porque como dice la Corte la contribución (pág. 24) "se impone sobre la *entrega, al consumarse* las ventas, de aceite combustible que previamente se ha importado en adeudo y se ha retirado, libre de derechos, para entregarse a las embarcaciones en los puertos de Puerto Rico para ser usado como combustible en sus viajes a puertos de los Estados Unidos o de países extranjeros. (Bastardillas nuestras).

No obstante, supongamos *arguendo* que la Corte tuvo la intención de resolver que bajo la Ley Butler la mercancía está sujeta a las contribuciones insulares de *rentas internas* mientras todavía está bajo la custodia de la aduana. Sin embargo, en ausencia de la Ley Butler, según indica el razonamiento tanto de la mayoría como el de la minoría, una contribución local sobre la *propiedad* no puede alcanzar mercancía que como en este caso todavía está bajo la custodia de la aduana en proceso de importación, ya que no se ha expedido por el colector el permiso de entrega de la mercancía al importador. Véanse también, *Waring* v. *The*

*Mayor,* 8 Wall. 110, 116 *et seq.;* casos citados en *Porto Rico Brokerage Co.* v. *United States,* supra, págs. 615–16, opinión disidente; *Washington Chocolate Co.* v. *King County,* 152 P.2d 981, 984 (Wash., 1944).

*Tres Ritos Ranch Co.* v. *Abbott,* 105 P.2d 1070 (N.M., 1940), anotado en 130 A.L.R. 963, *In re Miller Land & Livestock Co.,* 56 F. Supp. 34 (Mont., 1944) y *State* v. *Harper,* 188 S.W.2d 400 (Tex., 1945), son distinguibles. Allí se importó ganado a un estado y se mantenía en un gran rancho donde pastaba, engordaba, se mezclaba con ganado doméstico, y se vendía. Las cortes resolvieron que el ganado importado estaba sujeto a la contribución estatal, no obstante el esfuerzo de querer hacer del rancho un almacén de adeudo, debido a que el ganado se mezcló con toda la otra propiedad dentro del estado. Aquí la mercancía ni había sido entregada por la aduana ni se había utilizado como en los casos de *Tres Ritos, Harper* y *Miller* en un obvio intento de tergiversar el significado y el propósito de las leyes federales sobre almacenes de adeudo.

En una situación análoga, se resolvió que una contribución de venta infringía la disposición constitucional que prohibía una contribución sobre exportaciones, aplicada a artículos entregados a un porteador público para exportación. *Spalding & Bros.* v. *Edwards,* 262 U.S. 66. La Corte dijo a la pág. 69: ". . . tenemos que fijar el punto en que. . . debe decirse que comienza la exportación. . . . mientras los artículos estaban en proceso de fabricación sin embargo estaban sujetos a contribución si se tenía la intención de exportarlos. . . Por otro lado nadie dudaría que estaban exentos una vez puestos a bordo de la embarcación con destino a Venezuela y expedido el conocimiento de embarque." Véanse también, *Peck & Co.* v. *Lowe,* 247 U.S. 165, 171, 173; *Turpin* v. *Burgess,* 117 U.S. 504, 507. Pero *cf. Richfield Oil Corp.* v. *State Board of Equalization,* 163 P.2d 1 (Calif., 1945), revisión concedida por la Corte Suprema de los Estados Uni-

dos, 14 U.S.L. Week 3334, comentado en 59 Harv. L. Rev. 627. Sin embargo, aun el caso de *Richfield,* si bien afirma que el caso de *Spalding* expresa (pág. 3) ''conclusiones limitadas con referencia al campo de la contribución estatal que han sido dejadas sin efecto por recientes decisiones de la Corte Suprema de los Estados Unidos'', admite que mercancía entregada a un porteador público como la del caso de *Spalding* está en proceso de exportación y no puede imponérsele contribución. Y si se prohibe la contribución sobre una exportación una vez puesta a bordo de una embarcación que está próxima a zarpar propiedad de un porteador público, parece razonable decir que una contribución local sobre una importación está de igual manera prohibida cuando la mercancía todavía está a bordo de la embarcación bajo la custodia de las autoridades de aduana quienes todavía no han expedido el permiso de entrega al importador.

En virtud de nuestras conclusiones de que esta mercancía estaba todavía en proceso de importación el 15 de enero y estaba por tanto exenta de la contribución insular sobre la propiedad provista en el artículo 297 del Código Político, *la resolución del Tribunal de Contribuciones declarando sin lugar la querella será revocada y se devolverá el caso con instrucciones de que se dicte resolución a favor de la contribuyente.*([25])

---

([25]) Suponiendo, sin decidirlo, que la mercancía traída aquí de los Estados Unidos y que todavía no se ha descargado de la embarcación que la sitúa en un puerto de la isla para el día contributivo, está sujeta a nuestra contribución sobre la propiedad, podría argumentarse que esto resultaría en un discrimen contra la mercancía continental y a favor de la mercancía extranjera. Sin embargo, esto ocurriría muy raras veces, ya que la mercancía se encontraría en esta situación una sola vez al año. Además, en muchos casos los derechos de aduana, pagados solamente por la mercancía extranjera, serían mayores que la contribución sobre la propiedad, pagada solamente por la mercancía continental. Y bajo la Ley Butler, la contribución de rentas internas—de ordinario la contribución más alta de todas—generalmente se aplicaría por igual a la mercancía extranjera y a la continental.

Por otro lado, podría haber más discrimen sustancial contra la mercancía continental—que está sujeta a contribución insular sobre la propiedad tan pronto como es traída a Puerto Rico aún si se encuentra en el paquete original—si un

importador pudiera convencer a las cortes que la doctrina del paquete original propiamente dicha se aplicaba a importaciones en Puerto Rico y que en su consecuencia la mercancía extranjera no está sujeta a la contribución insular sobre la propiedad aún después de haber sido descargada en Puerto Rico, siempre y cuando que se conserve en el paquete original y no se venda o use. Véanse *Hooven & Allison Co.* v. *Evatt,* supra, págs. 667–8, opinión disidente págs. 689–90; *Southern Pac. Co.* v. *City of Calexico,* 288 Fed. 634, 640–1 (Calif., 1923). Pero otra vez aquí este alegado discrimen se contrapesaría en muchos casos mediante el pago de los derechos de aduana, que son ingresados en el Tesoro Insular y que son más altos que la contribución insular sobre propiedad, de la cual las importaciones estarían inmunes temporalmente. Y, como hemos visto, la contribución que de ordinario es la mayor—la de rentas internas—generalmente es la misma para ambas mercancías, la extranjera y la continental.

De cualquier modo, el remedio para uno o ambos discrímenes, que pueden o no existir, debe venir del Congreso y de la legislatura insular, y no de las cortes.